758 F.2d 1221
 Barbara A. GROSSART, Plaintiff-Appellant,
v.
Harry A. DINASO, Herbert F. Elzinga, Robert H. Telander,
Individually and in their capacity as Trustees of
the Town of Worth, and the Town of
Worth, Defendants-Appellees.
 No. 84-1338.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 14, 1984.
Decided April 3, 1985.
 
 Burton S. Odelson, Odelson & Assoc., Evergreen Park, Ill., for plaintiff-appellant.
 Ralph L. Rehnquist, Oak Lawn, Ill., pro se.
 Before CUDAHY and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.
 SWYGERT, Senior Circuit Judge.
 
 
 1
 Barbara Grossart, the plaintiff-appellant, filed suit against the Town of Worth (an Illinois township hereinafter referred to as "the Town") and its Board of Trustees (hereinafter referred to as "the Board") alleging that she was discharged from her employment with the Town because of her politics, in violation of her first and fourteenth amendment rights. After a bench trial, the district judge entered judgment for the defendants. We affirm.
 
 
 2
 * A. Facts
 
 
 3
 Unless otherwise noted, the uncontested facts are as follows. Grossart was hired as a bookkeeper by the Town in October 1973. At that time, she as well as all five members of the Board, the governing body of the Town, were members of the Republican Party. Between 1973 and 1977 Grossart was an active member of the party, serving as precinct captain and election judge.
 
 
 4
 In 1977 Dr. Joseph McCarthy, a Democrat, was elected Town Supervisor and member of the Board. McCarthy retained Grossart as bookkeeper and soon came to rely on her as a "fount of information." Her duties evolved, becoming "more intense" as the Town's finances became more complex. She became responsible for preparing quarterly payroll reports; drafting responses to IRS notices; complying with federal recordkeeping guidelines governing the administration of federal revenue sharing funds, which had to be strictly segregated from other Town funds; keeping records of and preparing annual reports for the Town fund, the general assistance fund, and the road district fund; preparing a monthly treasurer's report that informed the Board as to the current dollar amount in each fund; calling local banks to determine the current interest rates, so that the Town could invest its funds wisely; setting accounting codes for the new fiscal year's budget; working with the auditor to prepare an end-of-year audit; and monitoring the paperwork generated by the Town's purchases to ensure that orders were not duplicated, that the ordering department had sufficient funds to cover each purchase, and that invoices from vendors could be matched with purchase orders. In sum, Grossart testified that she "worked for the supervisor and board of trustees" and "was directed by them as to anything that was needed to be done regarding the finances of the township."
 
 
 5
 Between 1977 and 1981 Grossart became increasingly apolitical. She did not actively participate in the 1977 Republican campaign. She ceased serving as a Republican election judge and became politically inactive. Grossart defined her job as apolitical and expressed a desire to stay out of politics. On the other hand, she apparently contributed some funds to McCarthy's reelection campaign in 1981.
 
 
 6
 In 1981 three Republicans, also defendants in this case, were elected to the Board. Although McCarthy was reelected as Supervisor and member of the Board, the three Republicans formed a majority bloc that could outvote McCarthy and the one other Democratic member of the Board. The apparent leader of the Republican majority was defendant Harry Dinaso, who subsequently became finance chairman. Dinaso and McCarthy differed in their conception of the finance chairman's role. Dinaso believed the post entitled him vigorously to oversee the administration of Town finances; McCarthy believed that Dinaso was using the post to interfere with the day-to-day operations of the township, for which the Supervisor alone was responsible.
 
 
 7
 Finding McCarthy uncooperative, Dinaso turned to Grossart for information on Town finances. Partly as a reward for her good work and partly as a means of inducing Grossart to shift her loyalties from McCarthy to the Board as a whole, Dinaso persuaded the Board in 1982 to give Grossart a $1000 raise and to change her title to "Executive Administrative Assistant to the Board." Grossart's $18,000 salary made her the highest paid unelected official in the Town.
 
 
 8
 There was some evidence tending to show that Republican officials pressured Grossart to return to the party and that the Republican trustees viewed her job as a patronage post. It was uncontested that Republican Trustee Elzinga asked Town Auditor Westberg to urge Grossart to become an active Republican. McCarthy testified that shortly after the election, Dinaso compiled a list of employees who "had to go" and that his goal was a 60:40 ratio of Republican employees to Democratic employees. Barbara Grossart and a number of Democrats were on the list. On the other hand, Dinaso testified that his reference to a 60:40 ratio was just "kidding around," and Trustee Telander denied any knowledge of a "hit list." Grossart interpreted Dinaso's requests for more financial information as a solicitation to "spy" on McCarthy for the good of the Republican majority; Dinaso testified that he simply needed more information and that he had to overcome Grossart's personal loyalties to McCarthy.
 
 
 9
 Grossart was dismissed on February 28, 1983 after a heated executive session of the Board. The action was taken at Dinaso's instigation; the vote was 3-2 and divided on strictly partisan lines. The purported reason for the dismissal was Grossart's failure to obtain Dinaso's signature on two large purchase orders, pursuant to a policy set by the Board at Dinaso's instigation. Grossart was replaced by Kathy Spencer, a Republican with no bookkeeping qualifications.
 
 
 10
 Grossart testified that she believed the real reason for her termination was that she refused to "become Mr. Dinaso's right hand mand [sic] and provided him with any and all information that he needed." McCarthy believed that Dinaso's motive was to seize the opportunity to eliminate a high-profile employee as part of a "Get McCarthy" campaign. Dinaso admitted that the improper purchase orders were just one factor in his decision to instigate Grossart's termination. He said his other motives included his intuition that Grossart was not giving him all the financial information he desired, his feeling that he had been "betrayed" when Grossart suddenly revealed the existence of a $31,000 surplus after previously counseling austerity, Grossart's flippant answers to his questions about the improper purchase orders, and the sheer emotion of the moment.
 
 B. District Court Proceedings
 
 11
 Grossart filed an action alleging that the three Republican trustees, acting under color of State law, had deprived her of her constitutional rights of free association and belief by voting to terminate her employment for purely political reasons in violation of 42 U.S.C. Sec. 1983. After a bench trial the district court entered judgment for the defendants.
 
 
 12
 The court found that Grossart was not a policymaking employee and therefore could not be terminated for political reasons. Turning to the reasons for Grossart's termination, the court rejected the leading scenarios proposed by both sides. The court did not accept Grossart's contention that the unsuccessful efforts of Republican officials to re-enlist her in the party resulted in her termination. On the other hand, the court found that the purported reason given by Dinaso at the time of the termination--improper purchase orders--was also not the cause of the termination. Indeed, the judge concluded that Grossart had been a "very valuable employee" who "had rendered conscientious service" and had done a "very exemplary job." Finding that Dinaso "probably knows more about it [the reason for the discharge of Grossart] than anybody," the court reviewed the various reasons given by Dinaso in his testimony at trial and found them all to be nonpolitical.
 
 
 13
 The court first noted Dinaso's sense of betrayal. The court inferred that this sense of betrayal could have stemmed from Dinaso's belief that Grossart was "not giving him the financial and monetary information that he wanted at the time when he wanted it." But the court also noted that another permissible inference was that Dinaso believed that Grossart had "betrayed him by cooperating with the person with whom he was having a political struggle, a power struggle, I should say--not a 'political struggle'--Dr. McCarthy." But such a motive, according to the district judge, did not implicate the first and fourteenth amendments, inasmuch as such cooperation would be "a personal betrayal, not a political betrayal."
 
 
 14
 Next, the court noted Dinaso's assertion that two purchase orders had not been approved in accordance with proper procedures. Although this "was not the reason she was terminated," it did aggravate the relationship between Dinaso and Grossart. Whether Dinaso's criticisms of Grossart's performance in this regard were unfounded was not relevant because Dinaso did not need good cause to terminate her in order to comply with the Constitution.
 
 
 15
 Third, Dinaso asserted that he was motivated by Grossart's failure to reveal a budget surplus in a timely fashion. The court found that Dinaso "was upset by the fact that Mrs. Grossart did not give him the information about the money that was available until the last minute before the board meeting."
 
 
 16
 Finally, the court cited Dinaso's loss of "cool." "He got angry and took a precipitous action, which possibly in retrospect he may have felt was not entirely justified but he did it out of pique." But such a motive would not be constitutionally improper "unless the reason he acted out of pique was because of political motivation in order to deprive the plaintiff of her right to be a democrat or to be active in the Democratic party." In this regard, the court was "impressed" by the testimony of Kathy Spencer, who recounted the long history of emotional tension between the two that culminated in Dinaso's precipitous decision to discharge Grossart.
 
 
 17
 Summing up, the court concluded that "[o]ne thing led to another until, as I say, the whole matter came to a head and [Grossart] was terminated because of his [Dinaso's] dissatisfaction with the way in which she was cooperating with him and possibly his dissatisfaction with the closeness of her relationship with Dr. McCarthy." Having failed to find any credible political motivation underlying Grossart's discharge, the court entered judgment for the defendants.
 
 II
 
 18
 The constitutionally protected conduct in the case at bar is the first and fourteenth amendment freedoms of belief and association. Although a public employee may not have an entitlement to public employment, such employment is a government benefit that cannot be conditioned in a way that penalizes the exercise of the rights to free belief and association. Branti v. Finkel, 445 U.S. 507, 514-17, 100 S.Ct. 1287, 1292-94, 63 L.Ed.2d 574 (1980); Elrod v. Burns, 427 U.S. 347, 358-60, 96 S.Ct. 2673, 2682-83, 49 L.Ed.2d 547 (1976) (plurality).[1] The issue is whether the district court erred in finding that all the asserted reasons for Grossart's termination either were not supported by the evidence or infringed upon no protected conduct.
 
 A. The "Policymaker" Exception
 
 19
 This appeal involves difficult questions as to the scope of the first and fourteenth amendments. We need not reach these issues if Grossart can be considered a "policymaker," who could be terminated even if such an action was in retaliation against the exercise of the rights of belief and association. Branti, 445 U.S. at 517-18, 100 S.Ct. at 1294; Elrod, 427 U.S. at 360-73, 96 S.Ct. at 2683-89 (plurality). The rationale for this doctrine is that the state has a vital interest in "the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of its policies of the new administration, policies presumably sanctioned by the electorate," and this interest overrides the first amendment rights of policymaking employees. Elrod, 427 U.S. at 367, 96 S.Ct. at 2686 (plurality). Elected officials must be able to rely on the political loyalty and compatibility of a policymaking civil servant in order to seize the reigns of government and realize their electoral mandate. Nekolny v. Painter, 653 F.2d 1164, 1169-70 (7th Cir.1981), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). Given this overriding interest, the government may constitutionally dismiss policymaking civil servants for overtly political reasons. The test for a policymaker is "whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." Id. at 1170.
 
 
 20
 Resolution of the case at bar along these lines is inhibited by the district court's finding that Grossart was not a policymaker and by defendants' waiver of the issue on appeal by not contesting the court's finding in their brief as well as by conceding the issue at oral argument. Such a waiver may be overlooked in "exceptional cases or particular circumstances ... where injustice might otherwise result," Hormel v. Helvering, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941), or on "plain error" principles, i.e., where both the district court's disposition of the issue and counsel's concession of the issue are plain error, see Kessler v. Strecker, 307 U.S. 22, 34, 59 S.Ct. 694, 700, 83 L.Ed. 1082 (1939) (court has power to consider plain error not presented).
 
 
 21
 To the extent a cursory review of the merits of the issue may be relevant in deciding whether to disregard the waiver,[2] we note that the district court's decision to define Grossart as a nonpolicymaker was not manifestly unjust or grossly unsupported by the evidence. It should be stressed that the Town carries the burden on this issue, inasmuch as the policymaker exception constitutes a legitimate government interest that overrides the infringement of fundamental first and fourteenth amendment rights. Nekolny, 653 F.2d at 1169 (quoting Elrod, 427 U.S. at 367-68, 96 S.Ct. at 2686-87 (plurality)); see also Branti, 445 U.S. at 518, 100 S.Ct. at 1294. Although Grossart was the highest paid unelected official in the Town and an indispensable employee, there was ample evidence to support a finding that she was essentially a highly efficient source of objective information. The financial information she compiled was an essential prerequisite to informed decisionmaking by the Board, but the compilation of data according to generally accepted accounting principles and the need to base financial decisionmaking on such data were not "issues where there is room for principled disagreement on goals or their implementation." See Nekolny, 653 F.2d at 1170. Grossart did not have "meaningful input" on those issues that did implicate the Board's discretion,[3] and therefore, she was not a policymaker. See id.
 
 
 22
 In sum, the defendants waived the policymaker issue on appeal. We see no reason to disregard the waiver. Accordingly, we must consider whether Grossart, as a nonpolicymaker, was terminated for engaging in conduct protected by the first and fourteenth amendments.[4]
 
 B. Motives for Grossart's Discharge
 
 23
 The district court, in effect, defined two categories of possible motives for Grossart's discharge: (1) those that would penalize protected conduct, but did not in fact cause Grossart's termination and (2) those that may have caused Grossart's termination, but did not penalize protected conduct. If all the asserted motivations can be placed in these two categories, then protected conduct played no role in Dinaso's decision to terminate Grossart,[5] and we should affirm.[6]
 
 
 24
 As for the first category, Branti and Elrod hold that a public employee has a first and fourteenth amendment right to the party affiliation of her choice. If Grossart was terminated because she was not a Republican, she was entitled to section 1983 relief. The district judge, however, found no causal connection between the Republican party's unsuccessful solicitation of Grossart and her subsequent termination. We do not believe this finding was clearly erroneous.
 
 
 25
 Although it was uncontested that defendant Republican Trustee Elzinga asked Town Auditor Westberg to urge Grossart to become an active Republican shortly after the 1981 election, there was little evidence to link this event and Grossart's termination nearly two years later. The district judge reasonably concluded that the desire to re-enlist Grossart was a "natural" reaction on the part of party officials to the loss of what had been an active member and was in no way linked to Grossart's subsequent termination. As for the evidence that the Republican trustees considered Grossart's position a patronage post, the district judge could properly choose to believe the rebuttal evidence, specifically, Dinaso's testimony that he was "kidding" about the need for a 60:40 ratio between Republican and Democratic employees and Telander's denial of the existence of any "hit list."
 
 
 26
 The district judge placed the other motives in the second category: motives that may have caused Grossart's termination, but did not penalize any protected conduct. As for Dinaso's sense of betrayal, the district judge inferred that it stemmed, in part, from Dinaso's belief that Grossart was not giving him the information he wanted when he wanted it. Dinaso's dissatisfaction with Grossart's performance is wholly unconnected with any first amendment right of belief or association. To be sure, Dinaso's dissatisfaction was probably not well-founded and therefore did not give him good cause to terminate Grossart. But Dinaso did not need to show good cause for terminating Grossart; he had only to refrain from terminating her for reasons that penalized her exercise of first and fourteenth amendment rights. Dinaso's belief that Grossart was not performing her job satisfactorily--even if erroneous--did not implicate Grossart's rights.
 
 
 27
 Similarly, Dinaso's criticisms of Grossart's performance with respect to purchase orders and the untimely disclosure of the budget surplus were not constitutionally suspect motives for termination. And Dinaso's loss of "cool" may have been an irrational motive for termination, but the Constitution does not protect public employees from the emotionally-laden personnel decisions of their superiors.
 
 
 28
 On the other hand, we are troubled by the district judge's reasoning that one particular motive did not penalize protected conduct. The district judge inferred that Dinaso may have believed that Grossart had "betrayed him by cooperating with the person with whom he was having a political struggle, a power struggle, I should say--not a 'political struggle'--Dr. McCarthy." The judge reasoned that because Grossart was "caught in the middle" of a "power struggle" between Dinaso and McCarthy, she was not terminated for political reasons, and therefore her constitutional rights were not violated. We do not believe that constitutional adjudication should hinge on so facile a distinction between "politics" and "power." Politics, after all, is the struggle for power to shape the society and economy of the polity in accordance with certain ideological--or even selfish[7]--goals. The "power struggle" between Dinaso and McCarthy was a struggle for political power. If Grossart was terminated as a result of this power struggle, she was terminated for political reasons.
 
 
 29
 Because we cannot accept the district judge's reasoning in this regard, we must determine whether independent grounds justified his conclusion that Dinaso's resentment of Grossart's "cooperation" with McCarthy implicated no first amendment rights.[8]
 
 
 30
 We begin by rejecting the district court's assumption that the dispositive question is whether the termination can be defined as "political." It is not the business of the courts to regulate the political marketplace to ensure that public employees are terminated only for high-minded, nonpartisan, or politically disinterested reasons. Thus, McCarthy was wrong to question the constitutionality of Dinaso's alleged desire to eliminate a high-profile employee as part of a "Get McCarthy" campaign. To be sure, this would be a "political" motive, but the relevant inquiry is not whether the motive infringed some cognizable first amendment rights. See infra note 19; see also infra note 12. Our focus, then, is on the scope of Grossart's first amendment right, not on the fairness of Dinaso's motives. We must define the scope of those rights in a way that preserves some inviolable sphere of individual liberty which the state cannot penetrate yet also preserves the ability of political leaders to pursue the business of state, which in our system often means "playing politics."
 
 
 31
 The protected activity in the case at bar is the freedoms of belief and association. The specific associational right alleged is the freedom of political advocacy,[9] and the correlative freedom to abstain from political advocacy. The latter freedom is necessarily implied from the former, lest we arbitrarily exclude neutrality from the spectrum of political advocacy. See Roberts v. United States Jaycees, --- U.S. ----, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 ("Freedom of association ... plainly presupposes a freedom not to associate."); Hudson v. Chicago Teachers Union Local No. 1, 743 F.2d 1187, 1193 (7th Cir.1984). The specific right of belief at issue here is the right to maintain political beliefs--whether partisan or nonpartisan[10]--without fear of governmental retaliation. Branti, 445 U.S. at 515, 100 S.Ct. at 1293.[11] Grossart had an associational right, then, to refrain from becoming an advocate for Dinaso's ambitions for political power, and she also had a right, by virtue of her right of belief, not to be subjected to some litmus test of political orthodoxy. Those rights were violated if Dinaso required Grossart, as a condition of her employment, to manifest in some way that she was a Dinaso supporter or sympathized with an anti-McCarthy movement.[12]
 
 
 32
 On the other hand, requiring Grossart to be a zealous and loyal employee and to take action on behalf of Dinaso that inured to his political benefit did not infringe any first amendment right. As a public employee, Grossart could constitutionally be required to enforce policies she disapproved of; the first amendment does not protect insubordination. Thus, Grossart was wrong to believe she had a right not to become Dinaso's "right hand man." Being Dinaso's right hand man--his trusted source of objective financial information--was not a forced expression of personal belief in Dinaso; it was simply her job.
 
 
 33
 This principle, of course, is not absolute. Clearly, Elrod and Branti extend first amendment protection to insubordination if the job duty is to join a specific political party. We can discern from the cases and commentaries two means of defining the boundaries of the insubordination principle. Under both modes of analysis, the requirement that Grossart be a loyal and zealous employee infringed no first amendment right.
 
 
 34
 The first mode of analysis distinguishes between "expression" and "action" and its foremost advocate is Professor Thomas Emerson. See Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877 (1963). The first amendment lends virtually absolute protection to "expression."[13] A functioning democracy and individual self-realization within such a political system require free expression. There is no need to "balance" the government's interest in regulating expression against the individual's interest; the Founding Fathers already performed the requisite balancing by adopting the first amendment. Thus, despite its costs, free expression must be zealously protected against government regulation. "Action," however, can be regulated because action in and of itself expresses no ideas and, unlike thought and communication, is not within that vital realm of individual liberty that is so essential to individual self-fulfillment as to preclude state intrusion. See id. Emerson's mode of analysis has been applied by the Supreme Court in a line of cases distinguishing between "speech," which generally cannot be regulated, and "speech plus" conduct, which can. See, e.g., Cox v. Louisiana, 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965) (picketing and parading is conduct subject to regulation even though such conduct is intertwined with expression and association); International Brotherhood of Teamsters Local 695 v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957) (States may constitutionally regulate peaceful labor picketing for illegal purposes; such picketing is more than free speech); see generally L. Tribe, American Constitutional Law Sec. 12-7 (1978); cf. NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (peaceful economic boycott is protected by the first amendment, but threats of violence are not).[14]
 
 
 35
 In the case at bar, Grossart's duty of loyalty to Dinaso can be characterized as forced "action" not forced "expression." Dinaso wanted to wrest control of the Town's finances from McCarthy. That required Grossart to spend her time consulting Dinaso and to do everything in her power to see to it that Dinaso's need for information and control could be satisfied.[15] In short, Dinaso required action, not an expression of personal belief in his political ambitions. The conduct of a civil servant acting at the behest of an elected superior is not expressive; such conduct is not commonly attributed to the civil servant as a manifestation of her inner beliefs, but rather is attributed to her elected superior, for whom the civil servant acts as an agent. To be sure, Grossart had to assure Dinaso of her loyalty in the sense that she would do his bidding. But even such an expression of loyalty would not violate her first amendment rights. A civil servant's pledge that she will zealously perform all her duties despite her personal beliefs and biases in nonexpressive conduct. It is a commitment to professionalism and public duty, not an abandonment or sacrifice of personal belief.
 
 
 36
 Therefore, Dinaso's resentment of Grossart's close relationship with McCarthy was a constitutionally permissible ground for discharge to the extent that it manifested a loss of confidence in Grossart's ability to facilitate his policies despite her personal desire to remain apolitical (or pro-McCarthy, as the case may be). Such a requirement of professional loyalty regulated action not expression.[16] On the other hand, Grossart could disobey a requirement that she join the Republican Party. Such a requirement would constitute a forced expression of personal belief in the Republican Party. Similarly, Dinaso could not require Grossart to "spy" for him, if spying here implies something other than full disclosure of financial information. An agreement to "spy" on McCarthy's personal and political maneuverings would so transcend the bounds of ordinary zealousness that it would be commonly interpreted as a manifestation of personal advocacy for Dinaso's ambitions. In any event, we need not reach this issue because the district court did not accept Grossart's testimony that her job depended on her reenlisting in the Republican Party and/or agreeing to "spy" for Dinaso.[17]
 
 
 37
 The second mode of analysis is advocated by Professor John Hart Ely and builds on the Supreme Court's opinion in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). See Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 Harv.L.Rev. 1482 (1975). The Court in that case initially noted its predilection for the Emerson mode of analysis: "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." O'Brien, 391 U.S. at 376, 88 S.Ct. at 1678. But ultimately, the Court, recognizing the difficulties of distinguishing between expression and action, applied a four-part test for "incidental" restrictions of free expression:
 
 
 38
 [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedom is no greater than is essential to the furtherance of that interest.
 
 
 39
 Id. at 377, 88 S.Ct. at 1679.
 
 
 40
 Professor Ely argues that in O'Brien, "the Court shifts from ontology to teleology." Ely, supra, 88 Harv.L.Rev. at 1496. The court abandons the ontological, and perhaps impossible, task of distinguishing between expression and action and instead focuses on the intent and effect of the state action. Where the government's interest is "unrelated to the suppression of free expression," a balancing test is applied. Where the interest is related to the suppression of free expression, the "categorical" approach of Emerson is applied, i.e., with some narrow exceptions the state action is unconstitutional. Id. at 1496-1502.[18]
 
 
 41
 In the case at bar, the governmental interest is unrelated to the suppression of free expression. A democracy cannot function if governmental employees are allowed to veto policies they disagree with by failing to be zealous and loyal. And this requirement is applied to all employees regardless of their point of view and "would arise even if the ... [employee's] conduct had no communicative significance whatever." See id. at 1497. Therefore, if there is an incidental infringement of free expression in the case at bar, the balancing test of O'Brien applies. Assuming arguendo that Grossart's reluctance to become Dinaso's "right hand man" implicated her first amendment rights, this incidental restriction is no greater than is essential to the furtherance of the state's interest in governmental effectiveness: without a nonpartisan civil service able to perform its function regardless of the political views of its members, the modern state cannot operate.
 
 
 42
 If, on the other hand, Dinaso required Grossart to reenlist in the Republican Party in order to prove her loyalty, Dinaso's purpose would be related to the suppression of free expression. The effect of such a job duty would be to coerce belief by using the power of the state to reward those who either personally subscribed to a certain political ideology or who were willing to support a particular partisan organization. A requirement to "spy" on McCarthy would also be unconstitutional. Assuming arguendo that such a requirement was unrelated to the suppression of free expression, it would fail the O'Brien test as overbroad. It is difficult to see how spying by one elected leader on the personal and political maneuverings of another elected leader would serve a vital governmental interest. Certainly it would serve Dinaso's political interests, but "care must be taken not to confuse the interest of partisan organizations with governmental interests." Elrod, 427 U.S. at 362, 96 S.Ct. at 2684 (plurality).[19]
 
 
 43
 In sum, it was Grossart's job to retain Dinaso's confidence in her ability to implement his policies despite her personal political beliefs. Regardless of whether the Emerson or Ely mode of analysis is applied, such a job duty in no way implicates any first amendment right.[20] Dinaso's resentment of Grossart's close relationship to McCarthy, to the extent it reflected Grossart's failure to fulfill this job duty, was therefore a constitutional ground for termination.
 
 
 44
 Yet, it is difficult to resist the inference that Dinaso wanted something more than a commitment to duty despite personal reservations. Having found that Dinaso's emotional needs and jealousies played a role in his decision to terminate Grossart, the district judge could have reasonably inferred that Dinaso wanted an employee who personally believed in his political ambitions. Such pressure for expressive conduct would violate Grossart's first amendment rights of belief and association, under either the Ely or Emerson mode of analysis. Because the district judge relied on his erroneous distinction between a "political struggle" and a "power struggle," he did not reach this issue. The district judge should have, instead, determined the extent to which Dinaso demanded Grossart to commit her best efforts to his policies despite her personal political views, which was a permissible job requirement, and the extent to which he required personal belief in his political ambitions, which was not.
 
 
 45
 We do not believe a remand for further factfinding on this issue is either necessary or desirable. First, the district judge's unfortunate distinction between a "power struggle" and a "political struggle" was a product of Grossart's litigation strategy: the case was tried on the comparatively simple theory that Grossart's termination was in retaliation for her refusal to join or support the Republican Party.[21] At trial, "political" presumably meant "partisan." Accordingly, the district judge's distinction was intended not as a new first amendment doctrine but as a way of expressing his finding that Grossart's political/partisan theory was not supported by the evidence. Grossart waived her opportunity to present direct evidence on or to alert the district judge to a broader theory of liability, i.e., Dinaso's use of his authority to punish Grossart for her lack of personal belief in him.[22]
 
 
 46
 Second, viewed in the context of the evidence presented and the district judge's other findings of fact, the possibility that Dinaso terminated Grossart in retaliation for her personal views is too tenuous to merit a remand. In summing up the evidence, the district judge emphasized that Grossart "was terminated because of his [Dinaso's] dissatisfaction with the way in which she was cooperating with him." The district judge then added, as an afterthought, that the termination was "possibly" caused by Dinaso's "dissatisfaction with the closeness of her [Grossart's] relationship with Dr. McCarthy."
 
 
 47
 On remand, then, the district judge's task would be determine the extent to which this resentment reflected Dinaso's demand that Grossart commit her best efforts to his policies despite her personal views, which was a permissible job requirement, and the extent to which it reflected a demand for personal belief in his, rather than McCarthy's, political ambitions, which was not. At best, the district judge could conclude that an impermissible motive was one facet of a possible cause of Grossart's termination. The resulting causal link, if any, would be so speculative that the impermissible motive could not be held a "but for" cause of the termination within the meaning of Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).[23] In sum, while it may be the duty of this court to clarify the subtleties of first amendment jurisprudence, a remand for a purely academic exploration of those subtleties that cannot change the result below is certainly not appropriate.
 
 
 48
 The judgment of the district court is affirmed.
 
 
 49
 POSNER, Circuit Judge, dissenting.
 
 
 50
 As an original matter I would have thought Mrs. Grossart either a policy-making employee or a confidential employee, or both, who could be fired for her politics, see, e.g., Soderbeck v. Burnett County, 752 F.2d 285, 288 (7th Cir.1985), and that the district court's contrary finding was clearly erroneous. But the defendants concede the correctness of the court's finding and I am no more disposed than my brethren to override their concession.
 
 
 51
 That means we must evaluate this appeal as if Mrs. Grossart really were just a bookkeeper caught in the crossfire between Dinaso and Dr. McCarthy. If she would not have been fired but for her taking sides in a political struggle, then the defendants have violated her First Amendment rights--for I agree with my brethren (for reasons I shall try to explain) that the struggle between Dinaso and McCarthy was a political struggle--and the decision of the district court must be reversed. If she would have been fired anyway, because she was uncooperative or for any other reason (or no reason), just so it was not because of her politics, the decision must be affirmed. Since the district judge made no finding on this critical issue and the record is not clear enough on it to allow us to make his finding for him, the case should be returned to the district court for additional findings.
 
 
 52
 The heart of the district court's opinion is the following: "I draw the inference that she [Mrs. Grossart] betrayed him [Dinaso] by not giving him the financial and monetary information that he wanted at the time when he wanted it and therefore was not a faithful, conscientious public servant--but also one can raise the inference that she betrayed him by cooperating with the person with whom he was having a political struggle, a power struggle, I should say--not a 'political struggle'--Dr. McCarthy. That would be, in my opinion, a personal betrayal, not a political betrayal." In other words, there was a dual motive for Mrs. Grossart's firing: her failure to perform as a faithful public servant, and her siding with Dr. McCarthy. The district judge made no finding on whether, if she had not sided with Dr. McCarthy, but had failed for unrelated reasons to supply the financial information that Dinaso wanted, Dinaso would still have fired her. If not--if her siding with Dr. McCarthy was a necessary condition of her being fired--then as I have said the defendants violated her rights.
 
 
 53
 The district judge did not realize that it was essential to make a finding on this question, because he defined "political" too narrowly, as confined to purely partisan conflicts (this is made clear in several other passages of his opinion as well). If Dinaso and Dr. McCarthy had agreed on policy and Dinaso had simply hated McCarthy's guts and those of anyone who liked McCarthy, their struggle would indeed have been personal, nonpolitical. But the fact that the difference between them was not merely a party difference did not deprive it of a political character. Otherwise one would be driven to the strange conclusion that primary fights are not political. The rivalry of Dinaso and McCarthy was political, and indeed was less petty than many political rivalries; it was a struggle over the principles of governance of Worth Township--specifically, over the respective roles in that governance of the Supervisor (who was McCarthy) and the Board of Trustees (whose chairman was Dinaso).
 
 
 54
 If, however, though Mrs. Grossart took McCarthy's side and by doing so provoked Dinaso's enmity she would have been fired anyway, because she refused to give Dinaso the financial information that he wanted when he wanted it, then politics was not a "but for" cause of the injury of which she complains--and causation is as necessary in a constitutional-tort case as in an ordinary tort case. See, e.g., Parrett v. City of Connersville, 737 F.2d 690, 695 (7th Cir.1984). But the district judge did not think it necessary to make a finding on causation and I do not find the record clear enough on the question to allow us to make our own finding. Indeed, if I had to guess, I would guess, contrary to my brethren, that Mrs. Grossart's siding with Dr. McCarthy was indeed a "but for" cause of her being fired. After all, Mrs. Grossart was an exemplary (on the whole) and well-nigh indispensable employee, and it is unusual to fire such an employee for an isolated lapse; it seems quite possible therefore that she would not have been fired for her uncharacteristic dereliction of duty had it not been for her alignment with Dinaso's political enemy. Dinaso could fire her for being uncooperative even if her uncooperativeness was politically motivated; but he could not fire her for uncooperativeness because it was politically motivated; and that may well have been what happened. Anyway it is too fact-bound a question for us to try to resolve in the first instance.
 
 
 55
 I am, of course, troubled at the prospect of entangling the First Amendment in every petty squabble in every local government in the country. But I am not able to find a limiting principle consistent with Supreme Court precedent by which to dispatch this case. The district judge thought it possible to distinguish between a struggle over power and a struggle over politics. I disagree. Nothing is more natural than for a government official to convince himself that the powers of his office ought to be greater than they are; such convictions are close to the heart of political competition. The history of English liberty is the history of a power struggle between the Crown and Parliament, each thinking it ought to be supreme; and behind the American Revolution lies a power struggle between Parliament and the colonial legislatures. Unless and until the Supreme Court decides some day that the First Amendment does not apply with full force to state and local government after all, we cannot distinguish these historical illustrations of political strife from a struggle between the executive and legislative departments of Worth Township, Illinois.
 
 
 
 [1]
 The plurality in Elrod also reasoned that in addition to constituting an unconstitutional condition on a governmental benefit, patronage practices in and of themselves tended to coerce beliefs and therefore contravened the principle that government may not prescribe what the citizenry must accept as orthodox opinion. Elrod, 427 U.S. at 355-58, 96 S.Ct. at 2680-82 (citing Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1932)); see also Branti, 445 U.S. at 513-14, 100 S.Ct. at 1292 (discussing Elrod ). The majority of the Court did not ratify this alternative analysis inasmuch as Justice Stewart concurred only on the grounds that the case fell within the "unconstitutional condition" line of cases. See Elrod, 427 U.S. at 374-75, 96 S.Ct. at 2690 (Stewart, J., concurring)
 It is not clear whether the majority of the Court in Branti embraced both alternative lines of reasoning propounded by the Elrod plurality. We need not reach the issue because the subtle distinction between the two lines of reasoning is not relevant here. The unconstitutional condition line of analysis, which is unequivocally accepted by the Branti and Elrod Courts, is premised on the same right to belief and association as is the alternative line of reasoning. For, what makes the condition on employment unconstitutional is that it penalizes the employee's right to choose her own beliefs or ideological associates. See Branti, 445 U.S. at 515, 100 S.Ct. at 1293 ("If the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes."). The two lines of analysis diverge only where the penalty does not take the form of the withdrawal of the specific public benefit of employment from the plaintiff. Because that is not the case here, we do not reach the issue of whether both lines of reasoning contained in the Elrod plurality are binding precedent.
 
 
 [2]
 In order to determine whether a manifest injustice has been suffered or a plain error committed, some reference to the merits is necessary. But it would be anomalous to confine the court's inquiry in deciding whether to disregard a waiver to the merits of the issue waived. Important institutional interests are served by accepting a waiver, such as the efficiencies realized when the appellate court and the adverse party can rely on a party to narrow the issues in dispute through a waiver and the possibility of unfairness or mistake when the adverse party has not had an opportunity to address the waived issue adequately because of a reasonable reliance on the waiver. See generally United States v. White, 454 F.2d 435, 439 (7th Cir.), cert. denied, 406 U.S. 962, 92 S.Ct. 2070, 32 L.Ed.2d 350 (1971); R. Martineau, Modern Appellate Practice Sec. 3.14 (1983); Rubin, Toward a General Theory of Waiver, 28 U.C.L.A.L.Rev. 478, 488-89 (1981); Vestal, Sua Sponte Consideration in Appellate Review, 27 Fordham L.Rev. 477, 487 (1959). It is the deference owed to these policies, as well as the absence of any sign of a grossly erroneous decision on the merits, that compel us to enforce defendants' waiver
 
 
 [3]
 The district court did recognize "some evidence" that Grossart "had become so valuable to the township that she was able to make recommendations and even some policy decisions financially which might have put her in the position of being a sensitive or discretion-making, policy-making employee." Dinaso did testify that he looked to Grossart for "advice" and that they "discussed" ways of reducing the budget. The district court did not commit plain error by discounting such vague testimony and concluding that Grossart was not a policymaker
 
 
 [4]
 We do not mean to imply that the government's compelling interests can override a public employee's first amendment rights only where that employee is a "policymaker," as defined in Nekolny. In Soderbeck v. Burnett County, Wisconsin, 752 F.2d 285, 288 (7th Cir.1985), this court stated:
 Any implication of the plurality opinion in Elrod v. Burns that only a policy maker is unprotected by the principle announced in that case was superseded by the broader formulation in the majority opinion in Branti v. Finkel, which allows an employee to be fired if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518 [100 S.Ct. at 1294]. See also Livas v. Petka, 711 F.2d 798, 800-01 (7th Cir.1983). It need not be a policy-making office. If Rosalynn Carter had been President Carter's secretary, President Reagan would not have had to keep her on as his secretary.
 On the other hand, the Court in Branti narrowed the Elrod exception by noting that not all those who make "policy" should forfeit their first amendment rights: "The coach of a state university's football team formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats." Branti, 445 U.S. at 518, 100 S.Ct. at 1294. One district court in this circuit has attempted to harmonize Nekolny and Branti by adding an additional implicit factor to the Nekolny test: "Nekolny requires not only that defendants demonstrate that plaintiffs had meaningful input into decisionmaking but also that they had the type of input that jeopardized the ability of the new ... [public employer] to run his office." Gannon v. Daley, 561 F.Supp. 1377, 1383 (N.D.Ill.1983).
 We need not decide in this case the precise parameters of the Nekolny test. The policymaker exception envisioned in Nekolny is best viewed as a subset of the more inclusive exception announced in Branti. That is, the state's "vital interest in maintaining governmental effectiveness and efficiency," Branti, 445 U.S. at 517, 100 S.Ct. at 1294, requires that certain high-level employees with meaningful input into decisionmaking conform to the political beliefs of their elected superiors so that public policy can be effectively defined and enforced by the representatives of the electorate. Where an employee has no meaningful input into discretionary decisionmaking, then that employee is not a "policymaker" within the meaning of Nekolny. Because the district court did not commit plain error in finding such meaningful input to be lacking, we need not decide whether an additional element was necessary to invoke the policymaker exception.
 With respect to nonpolicymaking employees, restrictions on first amendment rights as drastic or perhaps less drastic than those applicable to policymakers may be necessary to achieve a proper balance between the state's compelling interests and individual rights. So-called "confidential" employees might be placed in this category. We need only hold here that the district court did not commit plain error in failing to place Grossart in this category.
 
 
 [5]
 Dinaso had de facto, though not de jure, power to terminate Grossart. It was uncontested that he instigated the action, and Grossart made no attempt to argue that Dinaso did not have the power to control the Board's decision in this regard. Indeed, Grossart characterized Dinaso as the leader of a Republican bloc that took concerted action to deprive her of her constitutional rights. See Appellant's Brief at 8-10, 13-17. Republican Trustee Telander's testimony also indicates that Dinaso had de facto control over whether to retain Grossart: "I just felt that every trustee was assigned to a certain committee or action and I felt that if Mr. Dinaso couldn't work with Barbara then I figured he had the right to ask for her dismissal." If Dinaso did not have de facto control over Grossart's dismissal, then we could affirm on the grounds that Grossart had failed to show any causal connection between Dinaso's alleged political animus against her and the harm she suffered (termination). See McClure v. Cywinski, 686 F.2d 541, 548-50 (7th Cir.1982)
 
 
 [6]
 The district court's method of analysis was unorthodox. It is not necessary to conclude that protected conduct played no role in the termination decision in order to find for the defendants. Rather, the causal analysis of mixed motives articulated by the Supreme Court in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), is applicable in this context. Nekolny, 653 F.2d at 1166-68. See infra note 23
 
 
 [7]
 Therefore, a distinction between "personal" and "political" struggles is as indefensible as one between "power" struggles and "political" struggles. See Transcript of Proceedings at 347 (distinguishing between a "personal" and a "political" betrayal)
 
 
 [8]
 That is, our inquiry concerns the scope of Grossart's first amendment rights. This task is not to be confused with that of defining the scope of the "policymaker" exception, discussed in part II(A), supra. There, we were concerned not with the scope of Grossart's first amendment rights, but with whether, under the circumstances, an admitted infringement of those rights could be justified by countervailing state interests
 
 
 [9]
 The first amendment freedom of association includes the right to join with others to pursue goals independently protected by the first amendment. L. Tribe, American Constitutional Law Sec. 12-23 (1978); cf. Roberts v. United States Jaycees, --- U.S. ----, 104 S.Ct. 3244, 3249-50, 82 L.Ed.2d 462 (1984) (in addition to protecting "expressive" association, i.e., association to pursue goals independently protected by the first amendment, the first amendment right of association protects "intimate" association, i.e., the right to maintain certain intimate human relationships). Political advocacy is such a goal. L. Tribe, supra, at Sec. 12-23 (citing Cousins v. Wigoda, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975)); see also Elrod, 427 U.S. at 357, 96 S.Ct. at 2681 (plurality)
 
 
 [10]
 Grossart's right to be "political," however, is more circumscribed than her right to be nonpolitical. The government may constitutionally restrain the overt political activity of public employees because a partisan civil service poses a threat to good administration, governmental efficiency, and the political process itself. See United States Civil Service Commission v. National Association of Letter Carriers, AFL-CIO, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (upholding Hatch Act's prohibition of federal employees taking an active part in political management or political campaigns); United Public Workers of America (CIO) v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 569, 91 L.Ed. 754 (1947) ("Congress may reasonably desire to limit party activity of federal employees so as to avoid a tendency toward a one-party system."); but see Elrod, 427 U.S. at 366-72, 96 S.Ct. at 2686-89 (plurality) (distinguishing Letters and Mitchell from political patronage context)
 
 
 [11]
 The dismissed employees need not prove an actual effect on their exercise of their rights to free belief and association; a tendency to chill such rights will suffice. See Branti, 445 U.S. at 517, 100 S.Ct. at 1294 ("there is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance")
 
 
 [12]
 These rights are not absolute. As discussed below, public employees owe their superiors a duty of loyalty to perform their jobs zealously despite personal disagreement with their superiors. Furthermore, these rights do not insulate public employees from the rough-and-tumble of politics. A public employer has discretion to terminate an employee for good cause, for no cause, or for "political" causes--i.e., as a vote of no confidence in the administrative bureaucracy or simply as a means of demonstrating one's power. But a public employer may not punish an employee for her personal beliefs
 In defining the limits of these first amendment rights, we pay no heed to the content of the belief or association. It is true that the Supreme Court has recently held that a public employee's right of free speech is only protected to the extent the speech relates to a matter of "public concern." Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Speech, however, must be articulated. As such, it is subject to reasonable time, place, or manner restrictions. The Court in Connick reasoned that open dissent expressed on the job has an adverse effect on the smooth operation of a public agency and that first amendment protection was not justified unless the speech concerned a significant public issue, as opposed to issues relating to such internal office matters as transfer procedures.
 Beliefs, however, are not subject to reasonable time, place, or manner restrictions. It is simply not possible for the state to have any legitimate interest in regulating a belief; a belief in and of itself poses no threat to legitimate state interests. Although the right to associate is subject to reasonable time, place, or manner restrictions, see, e.g., supra note 10, the Court made it clear in Branti and Elrod that the simple act of membership or nonmembership in a political party cannot be penalized. Similarly, Grossart's allegiance or nonallegiance with a political personality like Dinaso cannot, in and of itself, be penalized.
 In short, the public concern requirement of Connick cannot be applied in the Elrod/Branti context. Accord McBee v. Jim Hogg County, Texas, 730 F.2d 1009, 1017 (5th Cir.1984) (en banc) (Rubin, J., dissenting).
 
 
 [13]
 Emerson is willing to concede the existence of some "sectors of social activity which fall outside the area in which, under the basic theory, freedom of expression must be maintained." These sectors "include certain aspects of the operation of the military, of communication with foreign countries, and of the activities of children." Emerson, supra, 72 Yale L.J. at 918
 
 
 [14]
 On the other hand, the Court has not applied the expression/action distinction as rigorously as Emerson advocates. Instead, it tends to define conduct as a mixture of expressive and nonexpressive components and to determine the scope of the first amendment by resorting to "ad hoc" balancing of individual and state interests. See Emerson, First Amendment Doctrine and the Burger Court, 68 Calif.L.Rev. 422 (1980); cf. Note, The Scope of First Amendment Protection for Political Boycotts: Means and Ends in First Amendment Analysis: NAACP v. Claiborne Hardware Co., 1984 Wis.L.Rev. 1273 (criticizing the Court's failure adequately to define the theoretical basis for its decision, but concluding that the Court de facto applies the Ely mode of analysis)
 
 
 [15]
 Of course, Grossart also had to work for McCarthy, and she was in the unenviable position of having to choose between bosses; nevertheless her ultimate direction came from the Board, which Dinaso happened to control at that time. Like the district court, we question the wisdom of the decision to terminate Grossart. But our mutual dismay concerning the treatment of Grossart is constitutionally irrelevant: "Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." Connick, 461 U.S. at 146-47, 103 S.Ct. at 1689-90
 
 
 [16]
 On the other hand, the first amendment does protect some nonexpressive action under the rubric of the doctrine of "intimate" associational rights. That doctrine is not applicable here. The Supreme Court "has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." Roberts, 104 S.Ct. at 3249. These relationships are generally limited to familial settings and do not include emotional bonds between employees of public institutions. See id. at 3250-51. Therefore, Grossart's respect for McCarthy was not constitutionally protected as a form of the freedom of intimate association
 
 
 [17]
 The district judge did not accept testimony to the effect that Grossart was asked to "spy" on McCarthy. Rather, the judge found that Dinaso's motive was to acquire more financial information and that Dinaso believed he "was not able to get the financial information as promptly or as fully as he thought that he had a need for it from time to time." As for pressure on Grossart to rejoin the Republican Party, the judge found no causal link between such pressure and Grossart's termination
 
 
 [18]
 Tribe employs a similar analysis. See L. Tribe, supra, Secs. 12-1-12-8. This mode of analysis probably best explains the Supreme Court's treatment of "forced association" cases. Where an individual is forced by the state to make a financial contribution or otherwise associate with an organization for reasons other than the suppression of free expression, the Court has upheld the forced association by balancing the compelling state interest against the infringement of associational rights. E.g., Roberts, 104 S.Ct. at 3253 ("Minnesota's compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute [outlawing sex-based admission policies to a place of public accommodation] to the Jaycees may have on male members' associational freedoms"); Lathrop v. Donohue, 367 U.S. 820, 843, 81 S.Ct. 1826, 1838, 6 L.Ed.2d 1191 (1961) (plurality) (State requirement that lawyers join the State Bar infringed no associational right; State end of improving the Bar is legitimate and it can force lawyers to bear the cost of this improvement by forced financial contributions to the State Bar). To the extent the state goal served by forced association is related to the suppression of free expression, the forced association has been held unconstitutional. E.g., Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (State can require payment of dues to teachers' union; but to the extent dues are used for political advocacy, the union members' right to refrain from such political advocacy is violated)
 
 
 [19]
 On the other hand, McCarthy was wrong to question the constitutionality of Dinaso's alleged desire to eliminate a high-profile employee as part of a "Get McCarthy" campaign. A "Get McCarthy" motive was constitutionally relevant only insofar as it included a desire to "Get McCarthy" by terminating Grossart precisely because she held pro-McCarthy views
 
 
 [20]
 There are, of course, other important theorists besides Emerson and Ely, though their models have yet to be reflected in the caselaw. See, e.g., Baker, Scope of the First Amendment Freedom of Speech, 25 U.C.L.A.L.Rev. 964 (1978) (rejecting fundamental assumptions of conventional first amendment analysis); see generally Emerson, supra, note 13. Even Baker, however, would not extend first amendment protection to insubordination. The conduct of a government employee acting within the scope of her employment could be considered "speech not chosen by the speaker and which, therefore, cannot be attributed to the speaker's manifestation of her substantive values," a category of speech which is not protected under Baker's proposed model. See Baker, supra, 25 U.C.L.A.L.Rev. at 1002
 
 
 [21]
 On the other hand, Grossart did attempt to argue that Dinaso infringed her first amendment rights by pressuring her to "spy" for him. However, the district judge did not find sufficient evidence to support this theory of liability. See supra note 17
 
 
 [22]
 To be sure, strict enforcement of waiver doctrine may be inappropriate where it is necessary for the appellate court to clarify what theories of liability were open to the parties. But in view of our conclusion that further factfinding below would not change the result, see infra, we enforce the waiver
 
 
 [23]
 The Mt. Healthy causal and burden-shifting analysis is applicable to actions alleging violation of the rule of Elrod and Branti. See Nekolny, 653 F.2d at 1166-68. The first prong of the Mt. Healthy test requires the plaintiff to prove by a preponderance of the evidence that protected conduct was a substantial or motivating factor in the termination decision. This burden is "not insignificant"; a disgruntled employee terminated for legitimate reasons cannot satisfy it simply by showing she was in some respect allied with the political opposition. Nekolny, 653 F.2d at 1168. Moreover, the burden is not discharged by showing some causal connection, however tenuous, between protected conduct and the termination decision: "This standard is not satisfied if the plaintiff shows only that elimination of the protected activity may have been welcomed by the defendant or even that such activity played some minor role in the discharge decision." McClure v. Cywinski, 686 F.2d 541, 546 (7th Cir.1982)
 If the first prong of the Mt. Healthy test is satisfied, then the burden shifts to the defendants to show by a preponderance of the evidence legitimate motives that would have caused the termination even in the absence of protected conduct. Nekolny, 653 F.2d at 1166-68. Even assuming that Grossart could satisfy the first prong, the district judge would commit clear error if, on remand, he concluded that but for the presence of the impermissible motive, Grossart would not have been discharged. Viewed in the context of the district judge's other findings and all the evidence presented, the causal link, if any, is too tenuous to merit such a conclusion.