David A. CLARKE, H.R. Crawford, Charlene Drew Jarvis, Betty Ann Kane, Hilda H.M. Mason, James E. Nathanson, John Ray, Wilhelmina J. Rolark, Carol Schwartz, Frank Smith, Jr., Harry Thomas, Sr., John A. Wilson, and Nadine P. Winter, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 88–3190 (RCL).

United States District Court, District of Columbia.

Dec. 13, 1988.

I. Michael Greenberger (argued), James R. Bird, Richard M. Wyner, Mark S. Raffman, Shea & Gardner, Washington, D.C., and Gregory E. Mize, Gen. Counsel, Council of the District of Columbia, with him on the briefs, for plaintiffs.

Curtis E. Hall, Asst. U.S. Atty. (argued), Jay B. Stephens, U.S. Atty. and John D. Bates, Asst. U.S. Atty., with him on the briefs, for defendant.

John Vanderstar, Alan M. Kirschenbaum, Gregory J. Glover, Stanlake M. Samkange, Covington & Burling, Washington, D.C., Nan D. Hunter, William B. Rubenstein, American Civil Liberties Union, New York City, Arthur B. Spitzer, Elizabeth Symonds, American Civil Liberties Fund of the Nat. Capital Area, for amicus curiae American Civil Liberties Union and American Civil Liberties Union of the Nat. Capital Area.

Joseph E. Broadus, Arlington, Va., for amicus curiae Coalition for Religious Freedom.

Michael Stokes Paulsen, Kimberle Wood Colby, Center for Law and Religious Freedom, Merrifield, Va., for amicus curiae Nat. Ass'n of Evangelicals, Public Affairs Committee of the Southern Baptist Convention, American Ass'n of Christian Schools, Ass'n of Christian Schools Intern. and Christian Legal Soc.

Austin F. Frum, Paul J. Kiernan, Dunnells, Duvall, Bennett & Porter, Washington, D.C., and William B. Duffy, Jr., Greenman, Grossman & Duffy, Boston, Mass., for amicus curiae Unitarian Universalist Ass'n.

Dennis M. Desmond, Washington, D.C., for amicus curiae All Souls Church, Unitarian, Washington, D.C.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Plaintiffs in this action challenge the constitutionality of the "Nation's Capital Religious Liberty and Academic Freedom Act," also known as the "Armstrong Amendment," which was enacted October 1, 1988 by Congress as part of the 1989 D.C. Appropriations Act. The Armstrong Amendment reads as follows:

Sec. 145(a) This section may be cited as the 'Nation's Capital Religious Liberty and Academic Freedom Act.'

(b) None of the funds appropriated by this Act shall be obligated or expended after December 31, 1988, if on that date the District of Columbia has not adopted subsection (c) of this section.

(c) Section 1–2520 of the District of Columbia Code (1981 edition) is amended by adding after subsection (2) the following new subsection:

"(3) Notwithstanding any other provision of the laws of the District of Columbia, it shall not be an unlawful discriminatory practice in the District of Columbia for any educational institution that is affiliated with a religious organization or closely associated with the tenets of a

religious organization to deny, restrict, abridge, or condition—

"(A) the use of any fund, service, facility, or benefit; or

"(B) the granting of any endorsement, approval, or recognition,

to any person or persons that are organized for, or engaged in, promoting, encouraging, or condoning any homosexual act, lifestyle, orientation, or belief."

Pub.L. No. 100–462 (Oct. 1, 1988); text printed at 134 Cong.Rec. S9108 (daily ed. July 8, 1988).

Congress enacted the Armstrong Amendment in response to the decision of the D.C. Court of Appeals in *Gay Rights Coalition v. Georgetown University*, 536 A.2d 1 (D.C.1987) *(en banc )*. In that case, a majority of the court construed the D.C. Human Rights Act to require that Georgetown University provide facilities and services to gay student groups equivalent to those provided to other student groups, although the court held that Georgetown need not officially recognize such groups. The court found that requiring such services did not violate the free exercise rights of Georgetown University, which is affiliated with the Roman Catholic religion.

Plaintiffs are all thirteen members of the D.C. City Council, suing both in their capacities as individual Council members and as municipal taxpayers. Plaintiffs raise five separate challenges to the constitutionality of the Act, three of which concern the means by which Congress has sought to cause the Council to adopt an amendment to the D.C. Human Rights Act, and two of which challenge the substantive constitutionality of the language of the amendment. The plaintiffs first assert that, by conditioning funding for all city operations on the Council's action, the Act coerces political speech by the Council members in violation of their first amendment rights.

Plaintiffs further assert that this condition violates Congress' spending power and effects an unconstitutional taking of District funds. Plaintiffs also challenge the Act on its face, alleging that it discriminates among religions in violation of the establishment clause of the first amendment, and that it violates the speech and associational rights of District residents who express particular views concerning homosexuality. The United States has challenged the standing of the plaintiffs to raise these claims and has opposed each claim on the merits.

Plaintiffs first moved for a preliminary injunction to prevent the law from taking effect on January 1, 1989. The United States responded with a motion to dismiss or, in the alternative, for summary judgment and plaintiffs countered with a cross-motion for summary judgment. The issues have been fully briefed and oral argument has been held. For the reasons stated below, the Court holds that the Act is an impermissible burden on the freedom of speech of the Council members. Because of this holding, the court need not address the four remaining claims presented by the plaintiffs, or the plaintiffs' standing to raise those claims.[1]

## I. *Standing*

Defendant asserts that plaintiffs lack standing to raise their claim that the Armstrong Amendment violates their first amendment rights because plaintiffs in fact have no such first amendment rights. Although this argument is somewhat conclusory, and the court rejects it because the court finds that plaintiffs do have such rights,[2] the court notes that the law accords standing to legislators who have alleged an injury to their constitutional rights or duties. Thus, in *Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1106,

---

**1.** The Court thus expresses no opinion on the substantive constitutionality of the proposed amendment to the Human Rights Act. Congress is therefore free to enact the amendment itself, should it choose to do so.

**2.** Moreover, for purposes of standing, the court must assume the validity of the plaintiffs' claim

and construe the complaint in favor of the plaintiffs. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Moore v. U.S. House of Representatives*, 733 F.2d 946, 950 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985).

105 S.Ct. 779, 83 L.Ed.2d 775 (1985), the court reviewed legislator standing and concluded:

> From *Kennedy v. Sampson* to *Harrington v. Bush* and *American Federation of Government v. Pierce*, we have held that unconstitutional deprivations of a legislator's constitutional duties or rights, such as the nullification of a legislator's vote by illegal Executive action, may give rise to standing if the injuries are specific and discernible.

*Id.* at 952, *citing Kennedy*, 511 F.2d 430 (D.C.Cir.1974); *Harrington*, 553 F.2d 190 (D.C.Cir.1977); *Pierce*, 697 F.2d 303 (D.C. Cir.1982).

■ In *Moore*, House members alleged that the illegal origination of revenue-raising legislation in the Senate deprived them of their rights to debate and vote on the legislation. The court found that the claimed injury was sufficiently specific and concrete to satisfy requirements of standing. Likewise, in the instant case, the Council members have alleged a specific injury in the deprivation by Congress of their first amendment right to vote in accordance with their own views of the constitution and the public interest.[3]

■ Alternatively, the court finds plaintiffs have oath of office standing, under the principle recognized by the Supreme Court in *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).[4] In *Allen*, the Court found that legislators who had taken an oath to uphold the Constitution had standing to challenge the constitutionality of a law when they risked a concrete injury by refusing to enforce the law. In that case, plaintiffs

faced the choice of violating their oaths by enforcing a law which they believed to be unconstitutional or risking expulsion from their jobs. Plaintiffs here are similarly placed. Because Congress has conditioned all District funds on the Council's vote, the Council members must either vote in a way which they believe violates their oaths, or face almost certain loss of their salaries and staffs as well as water, police and fire protection.

## II. *The First Amendment Claim*

In determining whether the Armstrong Amendment violates plaintiffs' first amendment rights the court must make four separate findings. First, the court must find that the activity that is allegedly burdened, *i.e.* the process of proposing and voting to adopt the amendment, is "speech" within the meaning of the first amendment. Second, the court must find that the condition placed by Congress upon the "speech" constitutes a burden on the speech. Third, the court must determine whether the United States has a legitimate interest in restricting plaintiffs' speech; and fourth, the court must determine whether the United States' interest in restricting speech outweighs the value of the speech restricted. *See, e.g., First Nat'l. Bank of Boston v. Bellotti*, 435 U.S. 765, 776–77, 786–95, 98 S.Ct. 1407, 1421–26, 55 L.Ed.2d 707 (1978), *rehearing denied*, 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 1150 (1978).

■ Assuming for the moment that plaintiffs' voting is "speech" within the protection of the first amendment, the court finds that the burden and government interest determinations are clear.

---

3. In addition to satisfying the requirement of an "actual or threatened injury," the plaintiffs' allegation of coerced speech also clearly fulfills the remaining traditional standing criteria in that the injury can fairly be traced to the putatively illegal conduct of the defendant, and it is likely to be redressed by a favorable decision. *See Valley Forge Christians College v. Americans United for Separation of Church and State*, 454 U.S. 464, 474, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982).

4. Although the Ninth Circuit has held that *Allen* is no longer valid (*see City of South Lake Tahoe v. California Tahoe Regional Planning Agency*,

625 F.2d. 231, 236–38 (9th Cir.1980), *cert. denied*, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980)), the Supreme Court has subsequently reaffirmed *Allen* (*see Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 544–45, n. 7, 106 S.Ct. 1326, 1333 n. 7, 89 L.Ed.2d 501 (1985)). The *Bender* court did not find standing under *Allen* in part because plaintiff there was a *single* school board member who wished to challenge a decision of the majority. In *Allen*, as in the present case, a *majority* (indeed, here, all) of the voting members wish to challenge an act which they have been called on to adopt.

Congress has conditioned all funding for the District, including that which pays the plaintiffs' own salaries, on the adoption of a law, the exact language of which Congress has prescribed. The United States suggests that this condition does no more than force the Council members to "hold their noses" and adopt the law. First amendment protection, however, encompasses both the right to speak and the right not to speak, and even the olfactory burden to which the United States refers is constitutionally suspect. *See, e.g., Riley v. National Federation of the Blind,* ——— U.S. ———, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (first amendment necessarily comprises the decision of what to say and what *not* to say); *Board of Education v. Barnette,* 319 U.S. 624, 633, 63 S.Ct. 1178, 1183, 87 L.Ed. 1628 (1943) ("involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence"). Neither is the burden lifted by the fact that plaintiffs remain free to make their opinions known in other ways. *See, e.g., Wooley v. Maynard,* 430 U.S. 705, 722, 97 S.Ct. 1428, 1439, 51 L.Ed.2d 752 (dissent noting that coerced expression of state's motto on license plate could be negated with bumper sticker) (1977); *Pacific Gas & Electric Co. v. Public Utilities Commission,* 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986). In the instant case, even were the plaintiffs to make known that they voted for the law only in order to obtain funding, the message conveyed to their constituents would be ambiguous and might well give rise to the impression that plaintiffs failed to act on the courage of their convictions.

Moreover, the court does not find, as the United States suggests, that the threat to cut off all city funding merely "encourages" rather than coerces the plaintiffs' action. Of course Congress may, pursuant to its spending power, condition funding to the states upon the enaction of certain legislation by the states. The amount of funds involved in these cases, however, has never risen to a level such as to render inevitable the state's submission to Congress' will. The distinction between such coercion and "mild encouragement" was noted by the Supreme Court in *South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 2798, 97 L.Ed.2d 171 (1987); in that case, the Court rejected the argument that the conditioning of highway funds on raising the drinking age amounted to coercion where the amount of money involved amounted to only five per cent of funds otherwise obtainable under specified highway grant programs. The condition placed on the funds in the instant case, on the other hand, goes far beyond "mild encouragement".

Finally, Congress has no clearly defined interest, compelling or otherwise, in so burdening plaintiffs' speech. No one disputes that Congress could have enacted the amendment themselves. Congress' only arguable interest is in accommodating the free exercise of religion through causing the amendment to be adopted; the Armstrong Amendment however, plainly accomplishes this purpose through the most burdensome means.

Having concluded that the Armstrong Amendment creates a burden on plaintiffs' speech, and that no compelling government interest exists to justify that burden, the court turns back to examine its earlier assumption: namely, whether the plaintiffs' voting is "speech" within the protection of the first amendment. The keystone of the United States' argument is that plaintiffs' voting is not protected speech, and it gives three reasons for this conclusion. First, it argues, the act of voting possesses no intrinsic communicative quality. Second, it contends that official acts by public officials are not protected speech. Finally, the United States asserts that, even if legislators in general have a first amendment right to vote as they please, D.C. Council members do not, because of Congress' constitutional authority to legislate for the District pursuant to the Seat of Government Clause.[5]

---

**5.** Article I, § 8, clause 17 of the Constitution provides that congress shall have the power to "exercise exclusive Legislation in all Cases what-soever, over such District (not exceeding ten miles square) as may ... become the Seat of Government of the United States...."

■ The court finds no support for these arguments. The United States' argument that voting is not communicative is based on dictum of the Second Circuit in *United States v. City of Yonkers*, 856 F.2d 444 (2d Cir.1988), in which the Yonkers city council challenged a district court order requiring the council to adopt certain legislation pursuant to a court-approved consent decree. The court in that case questioned whether "the act of voting has sufficient expressive content" to be accorded first amendment protection. The court did not decide the question, however, but concluded that, even acknowledging the vote to be protected speech, the council's first amendment right was outweighed by the compelling state and public interest in obtaining compliance with federal court orders. *Id.*, at 457.[6]

In this case, all Council members are plaintiffs, and therefore at least one plaintiff would be required to propose the adoption of the amendment and another required to second the motion.[7] The "speech", in the traditional meaning of the word, of at least two plaintiffs would be coerced. Moreover, a majority of plaintiffs would be forced to vote in favor of adopting the amendment, which presumably requires at least the expression of "yea" or "nay." The court finds that this vote is of sufficient communicative value to be protected by the first amendment.

Conduct, moreover, if sufficiently expressive, may be protected as speech under the first amendment. In analyzing whether conduct is of sufficient communicative quality, the Supreme Court has used a contextual test: the actor must intend to convey a certain message, and the audience must be such that the message is likely to be understood by those who perceive the conduct. *See, e.g., Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (displaying American flag with peace symbol attached protected by first amendment); *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing armbands protected).

In the instant case, plaintiffs' act of voting will occur in a highly-publicized atmosphere. Plaintiffs, in voting against the amendment, wish to voice their conviction that the law is substantively unconstitutional, and against the public interest. Plaintiffs' votes are individually and collectively a matter of public record, and there can be no doubt that the message sent by a vote to reject the amendment will not be lost on the plaintiffs' constituents or on members of Congress.[8] In this context, the court fails to see how the act of voting for or against the amendment is any less expressive than an oral or written statement of plaintiffs' views on this matter of public policy.

Moreover, because the vote concerns an important public issue, the message which plaintiffs wish to convey with their voting may be deemed "core political speech." The first amendment "affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) *citing Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957). Accordingly, under traditional first amendment analysis, the court finds that the plaintiffs' votes are speech and cannot be coerced absent a compelling government interest.

6. Notably, the court did not say that the vote was not protected because of its official nature, or because legislators lack first amendment protection for their votes. Moreover, the context of that case, in which the council had repeatedly refused to act to comply with both court orders and the Council's own prior agreement to a consent decree, makes clear that the court could not achieve the remedy ordered through any less burdensome means.

7. The court was advised at oral argument that the Council acts under the normal rules of parliamentary procedure.

8. At least some constituents undoubtedly see the vote as a test of the Council members' political will and convictions on both the issues of home rule and protection of gay rights.

The United States next contends that the official nature of plaintiffs' votes deprives the act of first amendment protection. This theory appears to be derived from an amalgam of two lines of judicial reasoning relating to the constitutional guarantees afforded government employees, in general, and legislators, in particular. These lines, however, do not lead to the conclusion the United States asserts.

The first line of reasoning evolves from the first amendment cases involving speech of public employees made in the course of their employment. Defendant analogizes the plaintiffs' situation to that of a judge or an executive employee who refuses to enforce a law with which he or she disagrees. This resistance, the United States contends, is not protected by the first amendment.

The court found no cases, however, in which speech was found to be unprotected because it was an official act or the speaker was acting in an official capacity. The threshold test, rather, asks whether the speech is of public concern. Assuming it is, the speech is protected, and courts must then determine whether the value of the speech outweighs the government's interest in maintaining efficiency and control in the workplace. *See, e.g., Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (determination "requires 'a balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'") (citing *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). Moreover, the balancing of these competing interests by the courts has not been undertaken lightly; the Supreme Court has required that the government show significant harm to its interests resulting from the employees' speech in order for the government to prevail. *See, e.g., Rankin, supra,* 107 S.Ct. at 2899 (no evidence that statement made to coworker interfered with the effective functioning of the office); *A.P.W.U. v. U.S. Postal Service,* 830 F.2d 294 (D.C.Cir.1987) ("*Pickering* requires a 'particularized balancing' into the nature and weight of the competing interests, however, 'difficult' that judicial task may be.")

Plaintiffs' speech here is clearly of public concern. Thus, even were the court to analyze plaintiffs' rights as no greater than those of any public employee, plaintiffs would prevail, because nothing in the Home Rule Act suggests that plaintiffs have a duty to vote in accordance with the command of Congress. Moreover, even were the court to find such a duty, Congress has asserted no compelling interest in forcing plaintiffs to adopt the amendment, when Congress could easily have done so itself.

The United States' second line of cases involves suits by legislators. The United States correctly points out that plaintiffs in most of these cases claim a deprivation of rights guaranteed by the constitutional legislative process, rather than those guaranteed by the first amendment. *See, e.g., Coleman v. Miller,* 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939) (state senators have right to maintain the effectiveness of their votes under the fifth amendment); *Moore v. U.S. House of Representatives,* 733 F.2d 946 (D.C.Cir.1984) (right to vote and debate as required by Origination Clause); *Harrington v. Bush,* 553 F.2d 190, 213–14 (D.C.Cir.1977) (right to maintain effectiveness of votes). The United States reasons that, because no mention is made in these cases of any first amendment right, no such right exists.

In none of the cases cited above however, was the plaintiffs' right to vote as they wished threatened in any way. Rather, with the exception of *Moore,* the constitutional infringement occurred after a free vote was taken, when, subsequently, the votes were not accorded the weight due under the Constitution. In *Moore,* plaintiff House members were not told how to vote, but rather their opportunity to vote was circumvented by the Senate. In these cases, then, a first amendment right was not at issue. In the instant case, the Council members do not deny that Congress can constitutionally negate any effectiveness of

their vote, or deny them the opportunity to vote at all. Because Congress has directed them to vote a certain way, however, the Council members' first amendment rights are directly implicated.

Indeed, the cases above demonstrate that legislators do not generally leave their constitutional rights at the statehouse gate, and the court does not see why first amendment rights should be an exception. As the Supreme Court pointed out in *Bond v. Floyd*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966), the first amendment protects the most important function of legislators—the ability to freely discuss their views. *Bond* involved the refusal of the Georgia House of Representatives to seat Julian Bond, a duly-elected Representative, because of his statements criticizing the Vietnam War and the draft. In vindicating Bond's first amendment claim, the Court rejected the state's argument that loyalty required a stricter standard be applied to the speech of legislators than to private citizens. The Court made clear that,

> while the State has an interest in requiring its legislators to swear to a belief in constitutional processes of government, surely the oath gives it no interest in limiting its legislators' capacity to discuss their views of local or national policy [footnote omitted]. The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy.

*Id.*, at 135–36, 87 S.Ct. at 349.

It is clear to this Court that this "latitude" must of necessity include the right to vote freely. Without protection to vote as they wish, legislators would be unable to consummate their duty to their constituents. That common-sense conclusion is bolstered by the fact that the court has found only one case addressing a restriction on legislative voting. In that case, the district court invalidated a city ordinance requiring city Council members to vote either yea or nay on every resolution. That court found that the first amendment equally protected a legislator's right to abstain. *Wrzeski v.*

*City of Madison*, 558 F.Supp. 664 (W.D. Wis.1983). Accordingly, the court finds that the first amendment does extend to official acts of legislators.

■ Finally, the United States argues that, even if legislators in general have a first amendment right to vote as they please, plaintiffs do not, because of Congress' broad power to legislate for the District pursuant to the Seat of Government clause and the Home Rule Act. The court recognizes that the status of the D.C. Council members is unique within our constitutional framework. On the one hand, the Council members are elected officials accountable to their constituents. On the other hand, their power is at all times subject to the will of Congress, at the pleasure of which they act and give effect to their acts. Their power is a limited delegation of Congress' plenary power over the District pursuant to the Home Rule Act, which, in turn reserves Congress' right to legislate for the District. A key provision of the Home Rule Act states:

> Notwithstanding any other provision of this Act, the Congress of the United States reserves the right, at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject, whether within or without the scope of legislative power granted to the Council by this Act, including legislation to amend or repeal any law in force in the District prior to or after enactment of this Act and any act passed by the Council.

D.C.Code Ann. § 1–206 (1987).

The authority retained by Congress under this clause is undoubtedly broad, indeed as broad as Congress' plenary power to legislate for the District, but that authority itself is not limitless. Congress may at any time exercise its authority as the legislature, but that exercise of authority must be *constitutional*. The United States would have the court read this authority broadly enough to permit Congress to create an elected City Council, accountable to its electors, and then force the Council members to vote in accordance with

Congress' dictates. To hold otherwise, the United States argues, would be incongruous in light of Congress' power to veto or amend the Council's acts, or to abolish the Council entirely.

The court is not persuaded that Congress' constitutional authority over the District encompasses the power to install such a government structure. Congress' plenary power is still bounded by the Bill of Rights, and the court does not find that Congress' greater power over the District renders the Council members' speech completely unprotected. Indeed, the Supreme Court recently unanimously rejected the proposition that, because a state could ban certain types of political speech altogether, the state could freely impose limitations on such speech. *See Meyer v. Grant*, —— U.S. ——, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (state's power to ban political ballot initiatives altogether did not extend to power to require that petition-gatherers be volunteers). The *Meyer* Court concluded that, because the speech involved was "core political speech," the burden on the state to justify the restriction was "well-nigh insurmountable." *Id.*, 108 S.Ct. at 1894. The rationale of *Meyer* controls in the instant case.

Moreover, Congress chose to create a legislative body, not an administrative one. Its expressed intent was to create "a system of municipal government similar to that provided in all other cities throughout the United States" and one "responsible and accountable to the voters" (H.R.Rep. No. 482, 93d Cong., 1st Sess. 2 (1973)) with powers to legislate in certain areas specified by Congress. Members of City Council, like any other legislators, have first amendment rights, and the fact that Congress retains the greater authority does not render the speech of Council members unprotected. Indeed, this greater authority merely renders Congress' interest in restricting the Council's speech all the less compelling. Accordingly, the court finds that the Armstrong Amendment places an unjustified burden on the first amendment rights of plaintiffs. The court therefore holds that the "Nation's Capital Religious Liberty and Academic Freedom Act" is unconstitutional.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date, the Court hereby denies defendant's motion to dismiss or, in the alternative for summary judgment, and grants plaintiffs' motion for summary judgment. It is hereby ORDERED, ADJUDGED, and DECREED that Section 145 of Public Law 100–462, the Nation's Capital Religious Liberty and Academic Freedom Act, is unconstitutional, for the reasons set forth in the Memorandum Opinion.

The Court having now entered final judgment, the plaintiffs' motion for preliminary injunction is DENIED AS MOOT.