David A. CLARKE, et al.

v.

UNITED STATES of America, Appellant.

No. 88–5439.

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 1989.

Decided Sept. 26, 1989.

As Amended Nov. 8, 1989.

John C. Harrison, Associate Deputy Atty. Gen., U.S. Dept. of Justice, for appellant. John R. Bolton, Asst. Atty. Gen. at the time the brief was filed, and Jay B. Stephens, U.S. Atty., and Michael Jay Singer and Alfred Mollin, Attys., U.S. Dept. of Justice, were on the brief for appellant.

I. Michael Greenberger, with whom James R. Bird and Gregory E. Mize were on the brief, for appellees.

Lincoln C. Oliphant was on the brief for amici curiae U.S. Senators and U.S. Representatives, urging reversal.

Michael Davidson, Senate Legal Counsel, and Ken U. Benjamin, Jr., and Morgan J. Frankel, Asst. Senate Legal Counsel, were on the brief for amicus curiae U.S. Senate, urging reversal.

Rex E. Lee, Carter G. Phillips, and Mark D. Hopson were on the brief for amici curiae Nat. Ass'n of Evangelicals, et al., urging reversal.

John Vanderstar, Nan D. Hunter, Arthur B. Spitzer, Elizabeth Symonds, and Austin P. Frum were on the brief for amici curiae American Civ. Liberties Union, ACLU of the Nat. Capital Area, and Unitarian Universalist Ass'n, urging affirmance.

Murray R. Garnick was on the brief for amicus curiae Washington Council of Lawyers, urging affirmance.

Philip W. Horton entered an appearance for amicus curiae Washington Council of Lawyers, urging affirmance.

Before EDWARDS and BUCKLEY, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge EDWARDS.

Concurring opinion filed by Circuit Judge BUCKLEY.

HARRY T. EDWARDS, Circuit Judge:

The issue in this case is whether Congress, consistent with the Constitution, can compel members of the Council of the District of Columbia ("the Council") to enact a particular piece of legislation. In response to a judicial decision construing District of Columbia law to bar Georgetown University from discriminating on the basis of sexual preference, Congress passed the Nation's Capital Religious Liberty and Academic Freedom Act, Pub.L. No. 100–462, § 145, 102 Stat. 2269–14 (1988), also known as the "Armstrong Amendment." The Armstrong Amendment makes expenditure

of funds appropriated for the District in the current fiscal year contingent on the Council's adoption of the following measure:

> [I]t shall not be an unlawful discriminatory practice in the District of Columbia for any educational institution that is affiliated with a religious organization or closely associated with the tenets of a religious organization to deny, restrict, abridge, or condition—
>
>> (A) the use of any fund, service, facility, or benefit; or
>>
>> (B) the granting of any endorsement, approval, or recognition,
>
> to any person or persons that are organized for, or engaged in, promoting, encouraging, or condoning any homosexual act, lifestyle, orientation, or belief.

*Id.* § 145(c).

Instead of enacting this measure into District law, however, all thirteen members of the City Council ("appellees" or "Council members") filed suit in federal court, attacking the constitutionality of the Armstrong Amendment on various grounds. The District Court held that the Armstrong Amendment, by compelling Council members to vote in favor of a particular piece of legislation, violated the Council members' right to free speech, *see Clarke v. United States*, 705 F.Supp. 605 (D.D.C.1988), and appellant United States ("United States" or "the Government") appealed.

The Supreme Court long ago made it clear that "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 135–36, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966). Pursuant to this mandate, the First Circuit recently held that "the act of voting on public issues by a member of a public agency or board comes within the freedom of speech guarantee of the first amendment," and that "[t]here can be no more definite expression of opinion than by voting on a controversial public issue." *Miller v. Town of Hull*, 878 F.2d 523, 532 (1st Cir.1989). We agree. Accordingly, we hold that the votes of each appellee, like the votes of any other legislator,

constitute "speech" protected by the First Amendment. Because the Armstrong Amendment coerces the Council members' votes on a particular piece of legislation, and because none of the interests asserted to justify the Amendment is sufficient—under *any* standard of First Amendment review—to justify the abridgment of the Council members' free speech rights, we find the Armstrong Amendment unconstitutional. The judgment of the District Court is therefore affirmed.

## I. Background

### A. *The Structure of District Government*

To understand the full dimensions of this case, it is necessary to examine the nature and background of local government in the District. Article I, section eight of the Constitution authorizes Congress "[t]o exercise exclusive Legislation in all Cases whatsoever, over ... the Seat of the Government of the United States," a grant of power that has been construed to invest Congress with near-plenary authority over the structure of government in the District. *See, e.g., Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 76, 102 S.Ct. 2858, 2874, 73 L.Ed.2d 598 (1982); *Palmore v. United States*, 411 U.S. 389, 397–98, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973). Although Congress has provided for a variety of governmental frameworks since the District was incorporated in 1802, for most of the District's existence until 1973, its governors were selected without the electoral input of the District's residents. *See generally* H.R.REP. NO. 482, 93d Cong., 1st Sess. 47–49 (1973) [hereinafter H.R.REP. NO. 482], *reprinted in* 2 STAFF OF HOUSE COMMITTEE ON THE DISTRICT OF COLUMBIA, 93D CONG., 2D SESS., HOME RULE FOR THE DISTRICT OF COLUMBIA 1973–1974, BACKGROUND AND LEGISLATIVE HISTORY OF H.R. 9056 AND H.R. 9682 AND RELATED BILLS CULMINATING IN THE DISTRICT OF COLUMBIA SELF-GOVERNMENT AND GOVERNMENTAL REORGANIZATION ACT 1487–89 (Comm. Print 1974) [hereinafter LEGISLATIVE HISTORY]. This long absence of democratic government in the nation's capital drew

regular bipartisan objection,[1] and led to repeated legislative efforts to provide for representative government in the District. *See* S. REP. No. 219, 93D CONG., 1ST SESS. 3 (1973), *reprinted in* 3 LEGISLATIVE HISTORY at 2723 (noting that over 40 home rule bills were introduced in Congress between 1874 and 1972).

These efforts culminated successfully with the passage of the District of Columbia Self–Government and Governmental Reorganization Act ("Home Rule Act"), Pub.L. No. 93–198, 87 Stat. 774 (1973). Intended to "grant the inhabitants of the District of Columbia powers of local self-government," *id.* § 102(a), the Home Rule Act provides for a popularly elected Council and a popularly elected Mayor, *id.* §§ 401(a), 421(a), charged with responsibility for superintending municipal life in the District. The central aim of the Act, in short, was to provide the District "a system of municipal government similar to that provided in all other cities throughout the United States." H.R.REP. No. 482 at 2, *reprinted in* 2 LEGISLATIVE HISTORY at 1442. As House supporters of home rule explained:

> Restoration of an elected local government with powers of legislation and finance is, in the judgment of the committee, perhaps the most important step which this or any Congress can take for the Nation's Capital. Self-government is necessary to responsive and responsible government.

*Id.* at 50, *reprinted in* LEGISLATIVE HISTORY at 1490.

The Home Rule Act vests the District's legislative power in the Council. *See* Home Rule Act § 404(a). Under the legislative process established by the Act, the Council has the authority, subject to approval by the Mayor, to enact laws for the District by majority vote, and the power to override mayoral vetoes by a two-thirds vote. *See*

*id.* §§ 404(e), 412(a). The legislative power conferred by the Act to the Council, with enumerated exceptions, "extend[s] to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this Act." *Id.* § 302.

The Home Rule Act's delegation of legislative power, however, is neither complete nor irrevocable. Congress provided several mechanisms to assure itself a supervisory role in District governance. Most significantly, under section 601 of the Act, Congress "reserve[d] the right, at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject ... including legislation to amend or repeal any law in force in the District ... and any act passed by the Council." Home Rule Act § 601.[2] Moreover, although the Council and Mayor are obliged to prepare an annual budget for the District, *see id.* § 442, no expenditures may be made by the District—either of funds furnished to the District by the federal Government or of funds raised through the District's own means of revenue collection—unless approved by act of Congress, *see id.* § 446. Finally, of course, Congress retains its constitutional authority under article I, section eight to modify or even abolish the framework of local government established by the Home Rule Act.

### B. *The Armstrong Amendment*

The Armstrong Amendment was passed by Congress in response to the District's Human Rights Act, D.C. CODE ANN. §§ 1–2501 to 1–2557 (1981). Enacted by the Council in 1977, the Act was intended to prohibit discrimination in employment, housing, public accommodations and education based on "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, political

---

**1.** Presidents Eisenhower, Kennedy, Johnson and Nixon all strongly supported legislation aimed at establishing democratic government in the District. *See* H.R.REP. No. 482, at 2–3, *reprinted in* 2 LEGISLATIVE HISTORY at 1442–43.

**2.** In addition, any law enacted according to the legislative procedure established by the Home Rule Act must be submitted to Congress, which then has 30 days to disapprove the law by concurrent resolution before the law becomes effective. *See* Home Rule Act § 602(c)(1).

affiliation, physical handicap, source of income, and place of residence or business." *Id.* § 1–2501.

In 1987, two student gay rights groups at Georgetown University ("Georgetown" or "the University") brought suit under the Human Rights Act, seeking to compel Georgetown to grant them official "University Recognition," as well as the campus privileges corresponding to that status. *See Gay Rights Coalition v. Georgetown University,* 536 A.2d 1 (D.C.1987) (en banc). Georgetown, which is affiliated with the Catholic Church, defended on the grounds that the Human Rights Act did not apply to it and that, if it did, the Act violated the University's rights under the free exercise clause of the First Amendment. The District of Columbia Court of Appeals, hearing the case en banc, ruled that the Human Rights Act did not oblige Georgetown to "recognize" or otherwise endorse the gay student groups, but held that the Act did require Georgetown to afford the groups equal access to University facilities and services. *See id.* at 16–17. Rather than seek review of the decision in the United States Supreme Court, Georgetown agreed to a settlement based on the District of Columbia Court of Appeals' decision, indicating publicly through its President that it regarded the outcome of the case as an essentially fair one. *See* Letter from Timothy Healy, S.J., to faculty and alumni of Georgetown University (Mar. 28, 1988), *reprinted in* 134 CONG.REC. S9114–16 (daily ed. July 8, 1988).

Nonetheless, certain members of Congress disagreed, and decided that congressional consideration of the District's proposed 1989 budget presented an opportunity to initiate legislative action to overrule the *Georgetown* decision. On July 8, 1988, Senator Armstrong proposed the following amendment to the 1989 D.C. appropriations bill:

Sec. (a) This section may be cited as the "Nation's Capital Religious Liberty and Academic Freedom Act."

(b) None of the funds appropriated by this Act shall be obligated or expended after December 31, 1988, if on that date the District of Columbia has not adopted subsection (c) of this section.

(c) Section 1–2520 of the District of Columbia Code (1981 edition) is now amended by adding after subsection (2) the following subsection:

"(3) Notwithstanding any other provision of the laws of the District of Columbia, it shall not be an unlawful discriminatory practice in the District of Columbia for any educational institution that is affiliated with a religious organization or closely associated with the tenets of a religious organization to deny, restrict, abridge, or condition—

"(A) the use of any fund, service, facility, or benefit; or

"(B) the granting of any endorsement, approval, or recognition, to any person or persons that are organized for, or engaged in, promoting, encouraging, or condoning any homosexual act, lifestyle, orientation, or belief."

134 CONG.REC. S9108 (daily ed. July 8, 1988).

Debate over the Armstrong Amendment was dominated as much by considerations of parliamentary procedure as it was by concerns of policy. Senator Armstrong justified his Amendment as essential to protecting Georgetown's right not to subsidize activities it believed to be "sinful," 134 CONG.REC. S9104 (daily ed. July 8, 1988) (remarks of Sen. Armstrong), a religious conviction with which Senator Armstrong indicated his agreement, *see id.* at S9105 (same). Most of the discussion in the Senate, however, focused on whether the Armstrong Amendment comported with Senate Rule XVI,[3] which prohibits the enactment of substantive legislation through an ap-

---

**3.** Rule XVI provides that "no amendment offered by any ... Senator which proposes general legislation shall be received to any general appropriation bill...." Rule XVI, ¶ 4, *reprinted in* S.Doc. No. 33, 100th Cong., 2d Sess. 11 (1988) [hereinafter S.Doc. No. 33]. The Rule also prohibits the Senate Committee on Appropriations from "report[ing]" an appropriation bill containing amendments to such bill proposing new or general legislation." *Id.,* ¶ 2, *reprinted in* S.Doc. No. 33 at 11.

propriations bill. *See, e.g., id.* at S9125 (remarks of Sen. Byrd) (objecting to the Amendment as "a bad precedent" for "various and sundry amendments that constitute legislation on an appropriation bill"); *id.* at S9175 (daily ed. July 11, 1988) (remarks of Sen. Weicker). *See generally id.* at S9123–34 (daily ed. July 8, 1988). Supporters of the Armstrong Amendment in the House, like Senator Armstrong himself, based their defense on their perception that the Human Rights Act, as interpreted and applied by the District of Columbia Court of Appeals, violated the constitutional rights of religious institutions by requiring them to provide support for organizations advocating practices that were incompatible with the institutions' religious teachings. The Armstrong Amendment was finally passed as a part of the 1989 District of Columbia Appropriations Act, Pub.L. No. 100–462, 102 Stat. 2269 (1988) ("1989 D.C. Appropriations Act"), on October 1, 1988.

It is clear from the tremendous pressure the Armstrong Amendment brings to bear on the Council members that the Amendment was designed to compel the appellees to enact the specified amendment to the city's Human Rights Act. The 1989 District of Columbia Appropriations Act provided $3.743 billion to finance District expenses. *See id.* In the event that the Council failed to enact the amendment, the District would be legally barred from spending *any* of the appropriated funds, including the $3.206 billion—approximately 85% of the total—raised through the city's own means of revenue collection. *See id.* The price of refusing to vote "aye" when the amendment came to a vote in the Council, in other words, was to be the complete shut-down of municipal services in the District—from public hospitals and public schools, to garbage collection, law enforcement and virtually all other services essential to the health, safety and welfare of the District's residents. As the Government concedes, the severity of these consequences makes the Armstrong Amendment

a "mandate" that the Council members "cannot … ignore[ ]." Brief for the Appellant at 23 n. 13.

## C. *The Proceedings in the District Court*

Rather than take action one way or the other on the specified amendment, the thirteen members of the Council, including Council Chairman David Clarke, filed suit in both their individual and official capacities, seeking to have the Armstrong Amendment declared unconstitutional and to have its enforcement preliminarily and permanently enjoined. *See Clarke v. United States,* 705 F.Supp. 605 (D.D.C.1988). The Council members challenged the Armstrong Amendment as a violation of their rights to free speech under the First Amendment; as an unconstitutional condition on a spending measure; as an unconstitutional takings; as an establishment of religion; and as a violation of the speech and associational rights of District residents who express a particular position on homosexuality. *See* 705 F.Supp. at 607. The United States moved for summary judgment, and the Council members countered with a cross motion for summary judgment.

Finding the Armstrong Amendment to be a violation of the Council members' rights to freedom of speech, the District Court granted the motion of the Council members and entered judgment in their favor. The trial court found the votes of the Council members to be sufficiently expressive to qualify as "speech," and that the·severe consequences attendant to rejecting the amendment meant the Council members were effectively coerced into not opposing it. *See id.* at 609–10. The court also held that because Congress itself could have enacted the specified amendment to the Human Rights Act, the Government had no legitimate interest in the Armstrong Amendment sufficiently important to outweigh the Council members' speech rights. *See id.* at 609. The United States appealed, and we now affirm.[4]

4. Because it ruled in the Council members' favor on their First Amendment claim, the District Court did not reach the other constitutional

issues raised in their complaint. *See id.* at 607 & n. 1. The Council members have raised these claims again on appeal, but because we agree

## II. ANALYSIS

### A. *The Constitutional Prerogatives of the Council and the Armstrong Amendment*

■ Congress' authority over the structure of local government in the District of Columbia is indisputably broad, but it is not boundless. Congress has the discretion to create institutions of government for the District and to define their responsibilities only " 'so long as it does not contravene any provision of the Constitution.' " *Palmore v. United States*, 411 U.S. 389, 397, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973) (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 5, 19 S.Ct. 580, 582, 43 L.Ed. 873 (1899)). This limitation on Congress' powers is merely an instance of the general principle that the Government may not disregard the strictures of the Constitution when conferring discretionary benefits. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254, 262–63, 90 S.Ct. 1011, 1017–18, 25 L.Ed.2d 287 (1970) (welfare benefits cannot be conditioned on waiver of procedural due process rights); *Sherbert v. Verner*, 374 U.S. 398, 403–06, 83 S.Ct. 1790, 1793–95, 10 L.Ed.2d 965 (1963) (free exercise clause bars conditioning of unemployment benefits on agreement to work on Sabbath); *Speiser v. Randall*, 357 U.S. 513, 518–19, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958) (First Amendment bars conditioning of tax exemption on showing that taxpayer had not engaged in subversive advocacy). *See generally* Epstein, *The Supreme Court, 1987 Term—Foreword: Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 HARV.L.REV. 4, 6–8, 73–102 (1988).[5]

■ Through the Home Rule Act, Congress has furnished the District with a democratic form of government and vested the legislative power of this government in the Council. Therefore, members of the Council are "legislators" in every traditional sense. As such, they enjoy broad First Amendment protections in discharging their responsibilities. *See, e.g., Bond v. Floyd*, 385 U.S. 116, 135–36, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966). In *Bond*, the Supreme Court held that a state could not exclude an elected representative from its legislature because of his outspoken opposition to the Vietnam War:

> The manifest function of the First Amendment in a representative government requires that legislators be given the *widest latitude* to express their views on issues of policy.... Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them.

*Id.* at 135–37, 87 S.Ct. at 349–50 (emphasis added). Unless and until Congress restructures District government to divest the Council of its legislative functions, it must respect the broad First Amendment rights that the Council members enjoy by virtue of their status as legislators.

The issue in this case is whether the Armstrong Amendment is consistent with these rights. The United States concedes that the Armstrong Amendment does not alter the legislative process established by the Home Rule Act; the assent of a majori-

---

with the District Court that the Armstrong Amendment violates the First Amendment, we also do not address them. In particular, we express no opinion on whether the specified amendment to the Human Rights Act would be constitutional if enacted by Congress directly.

5. For this reason, the cases drawn to our attention by the United States in which the Supreme Court has acknowledged the broad authority of state legislatures over municipal institutions, *see, e.g., Hunter v. Pittsburgh*, 207 U.S. 161, 178–79, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907), do not come close to settling this case. Just as Con-

gress is obliged to observe the Constitution when it exercises its near-plenary authority over the affairs of the District, so the states are obliged to observe the Constitution when they exercise their power over the structure of municipal governments. *See, e.g., Gomillion v. Lightfoot*, 364 U.S. 339, 344–45, 81 S.Ct. 125, 128–29, 5 L.Ed.2d 110 (1960) ("Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution.").

ty of the Council's members is necessary before the specified amendment to the Human Rights Act, or any other measure before the Council, can become law. Nonetheless, the United States contends that the Armstrong Amendment has effectively redefined the responsibilities of the Council members for the 1989 fiscal year, imposing on them the "ministerial duty" of passing the specified amendment. *See* Brief for the Appellant at 22–23. Although we are skeptical that those members of Congress who supported the Armstrong Amendment conceived of the measure in these terms, we do not feel constrained to confirm our intuitions through an extensive inquiry into the history and meaning of the Armstrong Amendment. For the United States' position merely poses, without by any means answering, the question we must decide: whether Congress *can* impose the duty to enact the amendment to the Human Rights Act consistent with the constitutional rights of the Council members *as legislators*. We hold that it cannot.

## B. *Voting as Protected "Speech"*

■ The central issue in this case is whether the Armstrong Amendment is a regulation of speech for purposes of the First Amendment. The United States concedes that the condition that the Armstrong Amendment attaches to the District's funding exerts virtually irresistible pressure on the Council members to vote, and to vote in a particular way. *See* Brief for the Appellant at 23 n. 13. Threats considerably less extreme than this one have been held to trigger the First Amendment's "exacting . . . scrutiny," *Riley v. National Federation of the Blind,* —— U.S. ——, 108 S.Ct. 2667, 2678, 101 L.Ed.2d 669 (1988), when aimed at coercing affirmations of belief or conviction. *See, e.g., Speiser,* 357 U.S. at 518–19, 78 S.Ct. at

1338 (loss of tax exemption). The United States argues, however, that the Armstrong Amendment should be spared such scrutiny, because voting by the Council members is not protected speech. Like the First Circuit, "we have no difficulty" in concluding that "the right to vote freely on issues as they arise" falls within the broad First Amendment protections afforded legislators under *Bond. Miller v. Town of Hull,* 878 F.2d 523, 532, 532–33 (1st Cir. 1989).

A legislator's vote is inherently expressive. This is so, moreover, not simply because the act of voting requires a verbal utterance. Voting, as the Supreme Court has recognized, is the "individual and collective *expression of opinion* [ ] within the legislative process." *Hutchison v. Proxmire,* 443 U.S. 111, 133, 99 S.Ct. 2675, 2697, 61 L.Ed.2d 411 (1978) (emphasis added). It serves the function not only of mechanically disposing of proposed legislation, but of registering the " 'will, preference, or choice' " of an individual legislator on an issue of concern to the political community. *Montero v. Meyer,* 861 F.2d 603, 607 (10th Cir.1988) (quoting BLACK'S LAW DICTIONARY 1414 (5th ed. 1979)), *cert. denied,* —— U.S. ——, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989). For this reason, a legislator's voting record is "the best indication of [his or her] position on specific issues and his or her ideological persuasions." M. Barone & G. Ujifusa, THE ALMANAC OF AMERICAN POLITICS 1988 xviii (1988); *see also id.* at xvi–xviii (identifying and describing eleven ideological scales for rating congressional voting records).

The two federal courts that have directly considered the question of whether legislative voting is protected speech have both concluded that it is.[6] In *Miller v. Town of Hull,* 878 F.2d 523 (1st Cir.1989), a municipal board of selectmen ordered the elected

---

**6.** The Second Circuit expressly avoided this question in *United States v. City of Yonkers,* 856 F.2d 444 (2d Cir.1988), *cert. granted in part sub nom. Spallone v. United States,* —— U.S. ——, 109 S.Ct. 1337, 103 L.Ed.2d 808 *cert. denied,* —— U.S. ——, 109 S.Ct. 1339, 103 L.Ed.2d 810 (1989), assuming for the purpose of analysis that "the act of voting has sufficient expressive

content to be accorded some First Amendment protection. . . ." *Id.* at 457. That the Supreme Court may reach this issue when it reviews *Yonkers* does not prevent us from reaching the issue in this case. Moreover, as we explain below, *see* note 12 *infra,* we find *Yonkers* to be distinguishable on its facts from the case before us.

members of the town's redevelopment authority to vote to terminate the town's commitment to finance a public housing project. When the members of the redevelopment authority refused, they were suspended by the board. *See id.* at 527. Suggesting that the proposition was "unassailable," the First Circuit concluded:

> [W]e have no difficulty finding that the act of voting on public issues by a member of a public agency or board comes within the freedom of speech guarantee of the first amendment. This is especially true when the agency members are elected officials. There can be no more definite expression of opinion than by voting on a controversial public issue.

*Id.* at 532 (footnote omitted); *see also id.* at 533–34 (finding protected status of voting sufficiently "apparent," and violation of First Amendment sufficiently "egregious," to overcome claim of qualified immunity).

The District Court for the Western District of Wisconsin also equated a legislator's vote with speech in *Wrzeski v. City of Madison,* 558 F.Supp. 664 (W.D.Wisc.1983). In that case, the city council enacted a measure obliging individual council members to vote either in favor or against all pieces of legislation considered by the council. Noting that the plaintiff council member's "status as a legislator does not strip her of any rights she would otherwise enjoy under the First Amendment to speak freely or not to speak at all," and that the city council had failed to show that the requirement would further its effective operation, the court sustained the plaintiff's claim that the mandatory-vote provision violated her First Amendment right to abstain. *Id.* at 667.

The Supreme Court's recent decision in *Texas v. Johnson,* —— U.S. ——, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), lends further support to our conclusion that the votes of the Council members are protected by the First Amendment. Invalidating the respondent's conviction for burning an American flag, the Court in *Johnson* reaffirmed the test established in *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), for identifying conduct sufficiently expressive to merit First Amendment status. The relevant questions, the Court indicated, are "whether '[a]n intent to convey a particularized message [is] present, and [whether] the likelihood [is] great that the message will be understood by those who view[ ] it.'" *Johnson,* 109 S.Ct. at 2539 (quoting *Spence,* 418 U.S. at 410–11, 94 S.Ct. at 2730).

Under these criteria, there is no question that the votes of the Council members qualify as speech. Under the scheme of local government established by the Home Rule Act, the Council members perform the same functions that legislators perform in any other municipality. Like the votes of legislators elsewhere, the votes of the individual Council members are intended to express their positions on issues of public policy, and are understood to do so by the Council members' constituents and other observers.

The United States contends, however, that any vote by the Council on the *particular* issue of Congress' specified amendment to the Human Rights Act should be deemed conduct, not speech. The coercive effect that the Armstrong Amendment exerts on the Council members, the United States reasons, leaves them no real choice but to adopt the specified amendment. And because the Council members have no choice, their approval of the amendment is no longer an act of personal expression, but rather a "ministerial duty" that Congress may legitimately impose on the Council members pursuant to its near-plenary authority over the structure of the District's government. *See* Brief for the Appellant at 22–23. Pointing to the Supreme Court's decision in *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), the United States concludes that the Armstrong Amendment should therefore be upheld as a valid regulation of the "noncommunicative" component of the Council members' "conduct" in performing their official responsibilities. *See* Brief for the Appellant at 24–27.

We find this argument, including the United States' strained reliance on *Arcara,* to be wholly unconvincing. In *Arcara,* the

Court held that a state law mandating the closure of any building used for prostitution or other forms of lewdness could be applied to a bookstore without raising First Amendment concerns. *See* 478 U.S. at 704–07, 106 S.Ct. at 3175–77. Cases applying First Amendment scrutiny to generally applicable laws that incidentally affect speech were inapposite, the Court explained, because unlike the expressive activities at issue in those cases, "the sexual activity carried on in this case manifests *absolutely no element of protected expression.*" *Id.* at 705, 106 S.Ct. at 3176 (emphasis added); *see also id.* at 706 n. 3, 106 S.Ct. at 3177 n. 3 ("Here ... the 'non-speech' conduct subject to a general regulation bears *absolutely no connection to any expressive activity.*" (emphasis added)).

The same cannot be said of the Council members' votes. No matter how little choice the Council members have when considering the legislation contained within the Armstrong Amendment, their votes will retain their expressive character precisely because the Council members will be acting as *legislators.* As we have already concluded, and as the United States concedes, the Armstrong Amendment does not alter the legislative process established by the Home Rule Act. Before the specified amendment to the Human Rights Act can become law in the District, the amendment, like any other piece of legislation before the Council, must be enacted by majority vote of the Council's members. Thus, the Armstrong Amendment coerces an "individual and collective expression of opinion[ ]," *Proxmire,* 443 U.S. at 133, 99 S.Ct. at 2687, by the Council members on an issue of importance to the District as a political community.

Such coerced affirmation clearly violates the First Amendment. The right to free speech "necessarily compris[es] the decision of both what to say and what *not* to say." *Riley,* 108 S.Ct. at 2677.[7] Thus, the coercive character of the Armstrong Amendment, far from converting an act of protected expression into one of unprotected conduct, is the very source of the Amendment's constitutional deficiency.

### C. First Amendment Scrutiny

#### 1. Conventional Standards

■ Because we find that the votes of the Council members merit First Amendment protection, we must now determine whether the Government's interest in enforcement of the Armstrong Amendment is sufficiently strong to outweigh the Amendment's infringement of the Council members' free speech rights. It is unnecessary to engage in an extended inquiry into whether the United States must show that the Armstrong Amendment advances "a compelling state interest and ... is narrowly drawn to achieve that end," *Perry Educ. Ass'n v. Perry Local Educs.' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)—the appropriate standard of scrutiny for a content-based regulation of speech—or only that the Armstrong Amendment "furthers an important or substantial ... interest" and imposes "no greater [a restriction of speech] than is essential to the furtherance of that interest," *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968)—the standard appropriate to general regulations that only incidentally abridge speech. For we conclude that the interests asserted to justify the abridgment of the Council members' free speech rights are insufficient under either standard of First Amendment review.

It is undisputed that, under both article I, section 8 of the Constitution and section

---

7. The Armstrong Amendment's *directive* to vote in favor of the specified amendment is comparable to the compulsory flag salute law struck down in *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), and the law mandating display of the license-plate motto "Live Free or Die" struck down in *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). The Court invalidated those laws not simply because onlookers might mistakenly have concluded that those involuntarily compelled to assert the challenged messages agreed with them, but also because an individual has a right not to be made an "instrument [of] ... an ideological point of view he finds unacceptable." *Id.* at 715, 97 S.Ct. at 1435.

601 of the Home Rule Act, Congress could have directly enacted the legislation that is the subject of the Armstrong Amendment. Doing so, moreover, would have avoided imposing *any* restriction on the Council members' speech. Thus, because the Armstrong Amendment " 'burden[s] substantially more speech than is necessary to further' " the Government's interest in simply having the specified amendment incorporated into the D.C.Code, *Board of Trustees v. Fox,* —— U.S. ——, 109 S.Ct. 3028, 3034, 106 L.Ed.2d 388 (1989) (quoting *Ward v. Rock Against Racism,* —— U.S. ——, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989)), that interest is insufficient to sustain the Amendment.[8]

The United States and amici identify two interests supposedly advanced by forcing Council members to enact the legislation here at issue. First, it is claimed that conditioning District funds on legislative action by the Council allowed the Senate to secure an amendment to the D.C.Code without violating Senate Rule XVI's prohibition on "general legislation" in an appropriations bill.[9] *See* Brief of the United States Senate as Amicus Curiae at 9–10 & 10 n. 6. Second, the United States contends that the legislative procedure dictated by the Armstrong Amendment was aimed at facilitating future repeal of the specified amendment to the Human Rights Act. Since the Council generally has no authority to modify or override District laws passed by Congress, requiring the Council to enact the specified amendment preserved the Council's right to repeal the amendment at the end of the fiscal year, an objective harmonious with the principles of home rule. *See* Brief for the Appellant at 36–38.

Neither of these interests, however, is sufficient to redeem the Armstrong Amendment. The Senate's interest in protecting the integrity of its parliamentary procedures—the concern that dominated Senate debate over the Armstrong Amendment, *see* 134 CONG. REC. S9123–34 (daily ed. July 8, 1988)—is a respectable one, but it is not sufficiently important to outweigh rights guaranteed the Council members under the Constitution. Indeed, Rule XVI was not viewed as sufficiently important to prevent the Senate from directly approving general legislation in other portions of the 1989 D.C. Appropriations Act. *See* 1989 D.C. Appropriations Act § 135 (amending D.C.CODE ANN. § 11–1563(d) (1981) (judicial pension plan)). In any case, Congress could have secured the desired modification of the Human Rights Act consistent with Rule XVI by enacting the specified amendment independently of the 1989 D.C. Appropriations Act. Thus, we conclude that in this respect also the Armstrong Amendment burdens substantially more speech than is necessary to further the Government's asserted interest.

Nor is the asserted interest in facilitating repeal of the specified amendment by the Council sufficient to allow the Armstrong Amendment to survive scrutiny under the First Amendment. Indeed, we find this interest to be specious. As the United States concedes, nothing in the legislative history of the Armstrong Amendment suggests that Congress was motivated by this end. *See* Brief for Appellant at 38. Furthermore, it borders on inconceivable that a piece of legislation defended as necessary to protect the First Amendment rights of religious institutions in the District of Columbia could simultaneously be defended

**8.** The United States points out that *O'Brien's* requirement that an incidental regulation of speech be "no greater than is essential," 391 U.S. at 371, 88 S.Ct. at 1676, has been construed by the Supreme Court to be less demanding than the "least-restrictive-means" test used to evaluate content-based restrictions of speech. *See, e.g., Fox,* 109 S.Ct. at 3034 n. 3. In *Fox,* the Court explained that a regulation of conduct that incidentally affects speech is valid so long as it does "not 'burden substantially more speech than is necessary to further the govern-

ment's legitimate interest.' " *Id.* at 3034 (quoting *Ward,* 109 S.Ct. at 2758). Because the Armstrong Amendment *does* burden substantially more speech than is necessary to further *any* of the asserted interests, it necessarily fails to satisfy either the less demanding *O'Brien* standard or the more demanding content-based-regulation standard.

**9.** *See* note 3 *supra.*

as easy to repeal.[10] Courts face no obligation to credit "sham" interests asserted to justify restrictions of constitutional liberties. *See Wallace v. Jaffree,* 472 U.S. 38, 75, 105 S.Ct. 2479, 2499, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring). But even if we accepted this interest at face value and deemed it to be substantial or important, the fact remains that Congress could have passed the specified amendment and affirmatively authorized its repeal by the Council after an indicated date.[11] Thus, under this theory, too, the Armstrong Amendment must be deemed to abridge substantially more speech than is essential to the furtherance of the Government's asserted interest, and hence to be invalid.[12]

#### 2. *The* Pickering *Test*

The United States' final argument abandons all reliance on conventional standards of First Amendment review and suggests that even the relaxed degree of scrutiny under *O'Brien* is too strict in this case. Under this line of analysis, the United States contends that, for the purposes of the specified amendment to the Human Rights Act, the obligatory character of the Armstrong Amendment makes the relationship between Congress and the Council analogous to one between a superior and a subordinate. For that reason, the United States argues, we should assess whatever effect the Armstrong Amendment has on the speech of the Council members under the standard established in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), for evaluating restrictions of the speech of government employees. We reject this position as plainly untenable under existing First Amendment law.

*Pickering* examined the First Amendment claim of a public-school teacher who

---

**10.** The United States' suggestion that Congress decided to compel the Council to enact the specified legislation in order to accommodate home rule, in addition to being paradoxical, is directly refuted by the Armstrong Amendment's legislative history. *See, e.g.,* 134 CONG.REC. S9106 (daily ed. July 8, 1988) (remarks of Sen. Armstrong) ("I do not think home rule is the issue. We quite regularly make decisions which are contrary to our general presumption in favor of home rule."); *id.* at S9176 (daily ed. July 11, 1988) (remarks of Sen. Armstrong) ("There are some here today who want to dismiss this as a home rule issue, and it is not anything of the sort."); *id.* at H9188 (daily ed. Sept. 30, 1988) (remarks of Rep. Dornan) (expressing "hope that [debate over the Armstrong Amendment] is not going to be couched in terms of home rule").

**11.** The United States suggests that the Supreme Court's decision in *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), would have barred Congress from authorizing the Council to repeal the specified amendment if Congress had enacted the amendment directly. We read *Chadha* quite differently. In that case, the Court held that Congress could not reserve to itself the power unilaterally to disapprove regulations or orders issued by administrative agencies. This "legislative veto" mechanism, the Court reasoned, violated the presentment clause of article I, section 7, under which Congress is obliged to submit legislation to the President for his approval or disapproval. *See id.* at 944–59, 103 S.Ct. at 2780–88. Thus, *Chadha* plainly mandates that *Congress,* not *agencies created by Congress,* must comply with the presentment clause. Indeed, the decision presupposes that Congress may delegate to agencies broad legislative powers the exercise of which is not subject to the procedural mechanisms comprehended in article I. If Congress were to authorize the Council to repeal specified acts of Congress, we would analyze this grant of legislative power under the flexible dictates of the "nondelegation doctrine," *see generally Mistretta v. United States,* —— U.S. ——, 109 S.Ct. 647, 654–55, 102 L.Ed.2d 714 (1989), not under *Chadha.*

**12.** In *United States v. City of Yonkers,* 856 F.2d 444 (2d Cir.1988), *cert. granted in part sub nom. Spallone v. United States,* —— U.S. ——, 109 S.Ct. 1337, 103 L.Ed.2d 808 *cert. denied,* —— U.S. ——, 109 S.Ct. 1339, 103 L.Ed.2d 810 (1989), the Second Circuit affirmed a finding of contempt issued against city council members who refused to comply with a court order directing them to authorize a public housing project. Because the court order was based on a consent decree in which the city agreed to construct public housing as a remedy for past acts of racial discrimination, the city's failure to provide the housing was itself an illegal act. Thus, the court held that even if the refusal of the council members to comply with the court order was speech, such speech, under *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam), would not be protected by the First Amendment. *See Yonkers,* 856 F.2d at 457. However, because the refusal of the appellees in this case to enact the legislation contained in the Armstrong Amendment would not be illegal—or even subject to legal penalty *but for* the Armstrong Amendment—*Yonkers* clearly does not apply to this case. *Cf. Miller,* 878 F.2d at 533 n. 14 (distinguishing *Yonkers*).

was dismissed for publishing a letter critical of the school administration. The Court determined that this claim and the claims of like-situated public employees should be decided by balancing the employee's "interests[,] ... as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734–35; *see also, Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987). Applying this test, the Court in *Pickering* upheld the teacher's claim on the ground that the school had failed to show that his letter caused actual disruption of the school's operations. *See* 391 U.S. at 570–71, 88 S.Ct. at 1735–36. Nonetheless, pointing to numerous lower court decisions that have sustained restrictions of the speech of different civil servants, the United States argues that application of the *Pickering* balancing test in this case would result in the vindication of the Armstrong Amendment.

The United States' suggestion that *Pickering* controls the outcome of this case is obviously wrong. The members of the Council are not Congress' *employees;* under the Home Rule Act, they are independent *legislators,* intended to be "responsible and accountable to the voters" of the District. H.R. REP. No. 482 at 2, *reprinted in* 2 LEGISLATIVE HISTORY at 1442. Although Congress has the constitutional authority to change the character of the Council, it did not do so in the Armstrong Amendment.[13] As we have already discussed, so long as the Council members continue to occupy the status of legislators, Congress is obliged to respect the constitutional protections that attend that position.

The cases that the United States cites involving civil servants are therefore inapposite. As the Seventh Circuit explained in *Grossart v. Dinaso,* 758 F.2d 1221 (7th Cir.1985)—the case on which the United States places primary reliance—"the conduct of a civil servant acting at the behest of an elected superior is not expressive; such conduct is not commonly attributed to the civil servant as a manifestation of her inner beliefs, but rather is attributed to her elected superior, for whom the civil servant acts as an agent." *Id.* at 1232. In contrast, the Council members, because they are legislators, *are* presumed to express their personal will when they vote, subject only to electoral control by their constituents.

Attempts by the United States to analogize the Council members to ambassadors and other governmental "ministers" are similarly unavailing. An ambassador is an agent of the Government, commissioned to represent the United States in the "transaction of its diplomatic business." *In re Baiz,* 135 U.S. 403, 419, 10 S.Ct. 854, 858, 34 L.Ed. 222 (1890). When an ambassador performs official responsibilities, she is understood to be acting for the Government. Because speaking on behalf of the Government is an essential "requirement for the effective performance of" an ambassador's official responsibilities, removal of an ambassador who refused on political grounds to perform an assigned task would be justified by the Government's "vital interest in maintaining governmental effectiveness and efficiency." *Branti v. Finkel,* 445 U.S. 507, 518, 517, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980); *see also Elrod v. Burns,* 427 U.S. 347, 367–68, 96 S.Ct. 2673, 2686–87, 49 L.Ed.2d 547 (1976) (plurality). The Government has no similar interest, however, in controlling the political speech of popularly elected legislators. Consequently, Congress can no more demand partisan loyalty from the Council members than it can from the District's public defenders, *see Branti,* 445 U.S. at 519, 100 S.Ct. at 1295, or from the process servers and bailiffs of the District's courts, *see Elrod,* 427 U.S. at 360–73, 96 S.Ct. at 2683–89.

---

**13.** That Congress provided that the District would lose its funding rather than that the Council members would be terminated—the ordinary penalty for insubordination—confirms that Congress did not intend the Armstrong Amendment to establish an employment relationship between Congress and the Council members.

But even if *Pickering* did supply the appropriate line of analysis in this case, we would still hold the Armstrong Amendment to be unconstitutional. Insofar as we have already determined that the votes of the Council members constitute protected speech, we have little trouble reaching the further conclusion that any vote by the Council members on the specified amendment to the Human Rights Act would be speech dealing with a "matter of public concern." *See generally Rankin*, 483 U.S. at 384–87, 107 S.Ct. at 2896–98. It is also clear that the interest of the Council members in avoiding any restriction of their votes is extremely strong. First, as individual citizens, they possess the important right, recognized by the Court in *Barnette* and *Wooley*, *see* note 7, *supra*, not to be used as vehicles for a message with which they disagree.[14] Second, as legislators, they have an interest in being free to discharge their "obligation to take positions on controversial political questions," *Bond*, 385 U.S. at 136, 87 S.Ct. at 349, and otherwise represent their constituents in accord with their best judgment of the public interest. The Government's interest in restricting the speech of the Council members, on the other hand, is very weak. Because, as we have already determined, any of the interests asserted to justify the Armstrong Amendment could easily be achieved by direct congressional action, the United States cannot credibly claim that the power to coerce the votes of the Council members advances the efficiency of governmental operations in any significant way.

### III. CONCLUSION

Congress must observe the requirements of the Constitution when it exercises its broad discretion over the structure of government in the District. *See Palmore*, 411 U.S. at 397, 93 S.Ct. at 1676. Through the Home Rule Act, Congress has established a representative government for the District's residents, and has vested the legislative power of that government in the Council. So long as this form of government obtains, therefore, Congress must respect the "wide[ ] latitude" that the First Amendment guarantees the Council members *as legislators* "to express their views on issues of policy," *Bond*, 385 U.S. at 136, 87 S.Ct. at 349, including their "right to vote freely on issues as they arise." *Miller*, 878 F.2d at 532–33. Because the Armstrong Amendment coerces the Council members' votes on a particular piece of legislation, and because none of the interests asserted to justify the Amendment is sufficient—under *any* standard of First Amendment review—to justify the abridgment of the Council members' free speech rights, we find the Armstrong Amendment unconstitutional. The judgment of the District Court is therefore affirmed.

*Affirmed.*

BUCKLEY, Circuit Judge, concurring:

The Supreme Court's teaching is clear: If a statute regulating conduct imposes an incidental burden on expressive conduct, it is subject to First Amendment scrutiny, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 702, 106 S.Ct. 3172, 3175, 92 L.Ed.2d 568 (1986) (citing *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)), including the "important or substantial government interest"/"restriction ... no greater than necessary" test set forth in *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679. Although the Armstrong Amendment does not regulate conduct as such, it certainly falls within the *O'Brien* rationale.

As the affirmative vote required by the Armstrong Amendment of the D.C. Council members has "at least the semblance of expressive activity," *Arcara*, 478 U.S. at 702, 106 S.Ct. at 3175, I agree that the court's central analysis is compelled by Supreme Court precedent. Simply stated (and without burdening this summary with

---

14. The United States suggests that because the Council members remain free to express their views on the specified amendment by means other than voting, we should discount the strength of their interest in avoiding the abridg-

ment of speech imposed by the Armstrong Amendment. The Supreme Court rejected this argument in *Johnson, see* 109 S.Ct. at 2546 n. 11, and we reject it here.

the citations to be found in the court's opinion), it is this: As the Armstrong Amendment would require members of the District of Columbia Council to enact a particular amendment to the D.C.Code, it implicates the First Amendment; and as Congress could have amended the Code on its own authority, the Armstrong Amendment fails any of the relevant Supreme Court tests because it places *some* burden on the members' speech whereas none is required. (Certainly none can be justified by the contrived reasons advanced by the government and the Senate *amicus* in support of Congress' decision to require the District of Columbia to enact the amendment to its Code rather than achieving that end by direct congressional action. *See* court op. at 414–15.)

This summary constitutes both the basis and the limits of my concurrence because I see no purpose in expanding the discussion (as the court's opinion does) beyond the limits required to resolve what is an important case of first impression. Thus, for example, I would delete the last paragraph of its discussion of the *Pickering* test. Court op. at 416–17. Having decided that *Pickering* is inapplicable because members of the District of Columbia Council are not employees of the United States Congress, there is no need to engage in a discussion of what we might hold were this case governed by *Pickering.*

I would also delete the final paragraph of Part B. and its accompanying footnote. Court op. at 413. The first sentence of that paragraph suggests that the Armstrong Amendment violates the Constitution just because it commands members of the Council to cast a distasteful vote. As I understand the relevant law, the command, standing alone, merely *implicates* the First Amendment. The Armstrong Amendment *violates* the Constitution because its command both burdens the Council members' speech and fails the tests set forth in both *Perry* and *O'Brien. See* court op. at 413.

I find footnote 7 equally inappropriate as neither of the cases discussed in it is apposite. In the case before us, the infringement on the members' speech is incidental to the Armstrong Amendment's objective, which is to bring about an amendment to the D.C. Human Rights Act. While this would require the members to participate in a one-time-only vote with which they fundamentally disagree, the measure's purpose is to amend the Act, not to require Council members to give voice to a particular message. In contrast, as the Supreme Court noted in *Wooley v. Maynard:*

> Here, as in *Barnette,* we are faced with a state measure which forces an individual, as part of his daily life—indeed constantly while his automobile is in public view—to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable.

430 U.S. 705, 715, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977).

The footnote is unfortunate not only because *Barnette* and *Wooley* are so clearly distinguishable, but because, in context, it implies a basis for finding the Armstrong Amendment unconstitutional that goes beyond the application of the standards described in Part C.1. of the court's opinion. Court op. at 413. As it is, our decision today opens up enough new territory to potential judicial review to suggest the prudence of limiting its scope to essentials. As virtually no government or institution can act today except with the consent of its legislative or governing body, I suspect this court and others may be called upon to answer a number of questions as litigators explore the implications of our decision. At what point, for example, does a federal grant-in-aid program cross the line that separates the encouragement of state or municipal action from its coercion? Are the constitutional rights of corporate directors and university trustees comparable to those of state and municipal legislators? And when (if ever) is a particular government interest important enough to justify *any* burden on legislative speech?

For better or worse, we may have opened the door to more litigation than we can now appreciate.